ALLAN B. LEWIS, Special Adm'r of the Estate of Shara G. Lewis, Deceased, Plaintiff-Appellant, v. RAZZBERRIES, INC., d/b/a Razzberries Lounge, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—0067

Opinion filed December 6, 1991.

Corboy & Demetrio, P.C., of Chicago (Kevin G. Burke, of counsel), for appellant.

Querrey & Harrow, Ltd., of Chicago (Michael Resis, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Allan B. Lewis, special administrator of the estate of Shara B. Lewis, filed a complaint sounding in negligence against defendant, Razzberries, Inc., doing business as Razzberries Lounge, Richard E. Smith and James Karamaniolas. In this alleged wrongful death action, plaintiff's decedent was shot to death by a patron, Edward Siegelman, in a parking area adjacent to Razzberries. Plaintiff appeals the trial court's grant of summary judgment in favor of Razzberries, alleging that it owed a duty of care to protect against reasonably foreseeable criminal acts; that defendant voluntarily assumed a duty to provide protection; and that the tavern owner had sufficient notice of the potential risk of danger to plaintiff's decedent. (Siegelman was later convicted of involuntary manslaughter and sentenced to a term of imprisonment.) (Judgment was entered in favor of Razzberries, and no mention is made of Smith and Karamaniolas in this appeal.)

Josephine Jardine testified at Siegelman's criminal trial that on December 11, 1984, she met with plaintiff's decedent around 9:30 p.m. in Streamwood, Illinois. The two women proceeded to a local bar where they drank a couple of glasses of wine. Thereafter, around midnight, they drove Jardine's car to Razzberries, located on the corner of Higgins and Bartlett Roads near South Barrington, Illinois. Razzberries did not provide valet parking, nor was there a charge to patrons for parking. Jardine parked her car in an area which was neither paved nor improved with lines designated for the parking of vehicles. According to a plat of survey and title examination introduced into the record, Jardine's car was parked 23 feet off the southwest corner of the property and within the public right-of-way off Higgins Road. There were no signs delineating the property owned by Razzberries, nor were there any signs posted indicating the areas where it was permissible for patrons to park.

As she parked, Jardine noticed a familiar car owned by Siegelman, whom she had previously dated. Siegelman arrived at Razzberries at approximately 9 p.m. According to Al Andrews, the manager of Razzberries, Siegelman appeared very depressed and told him that he wanted to "hang one on" that evening.

Upon entering the tavern, Jardine stated that she and plaintiff's decedent were approached by Siegelman, and that he began to make threatening remarks to her. Jardine asked Siegelman to leave them alone. At one point, Siegelman grabbed Jardine's arm and told her that "I'm going to shoot you when you leave here." Jardine was not

afraid of Siegelman; rather, she became aggravated and annoyed at him. Jardine did not inform any of the tavern employees or the police about Siegelman's threats because she did not believe that Siegelman would harm her.

At approximately 1 a.m., Jardine and plaintiff's decedent decided to leave the tavern. Jardine indicated in her discovery deposition that Norman Richko, the bartender on duty, wanted to have an employee escort the women to their car. Jardine saw that Richko was busy fixing drinks for other patrons, and she waited approximately 20 minutes. While she was waiting for the escort, Siegelman again approached her, grabbed her arm and told her that he wanted her one more time. After Jardine rebuffed Siegelman's advances, he angrily walked back toward a corner of the bar. Jardine decided to wait no longer because she believed she had enough time to get into her car as she was parked near the building. The two women walked quickly to the car.

Jardine unlocked the car and entered the driver's seat while plaintiff's decedent walked around to the passenger's side. At that point, Siegelman began pounding very hard on the driver's window with both fists. Siegelman then walked away for approximately 5 to 10 seconds. After checking that plaintiff's decedent was safely inside the car, Jardine locked the door.

As Jardine attempted to put the key into the ignition, Siegelman again returned and began pounding on the car window. At that point, Jardine opened the car door. Siegelman suddenly pulled out a gun and leaned into the car. Jardine attempted to push the gun away from her. During this time, plaintiff's decedent was seated to her right and began screaming as she also tried to push the gun away. During the course of the struggle the gun went off once, fatally wounding plaintiff's decedent.

Jardine further testified in her discovery deposition that prior to that evening, Siegelman had never threatened her. She described him as "nice, kind, generous and then when I wanted to end the relationship, he was just like clingy, and I don't like clingy people." Siegelman had never struck Jardine. Jardine further testified that while Siegelman threatened her that evening, he did not tell her that he had a gun, and she had no reason to believe that he possessed a gun. According to Jardine, she was "afraid of a beating, not a gun."

Defendant Richard E. Smith stated in his discovery deposition that Razzberries had established a policy wherein employees frequently escorted female patrons to their cars at their request as a courtesy. In order to ensure the safety of their female patrons, em-

ployees would watch through the front door while they walked to their cars, regardless of where they were parked.

Jardine acknowledged that she was aware of this policy, and although she had previously patronized Razzberries alone, she had never requested an escort. Neither Jardine nor plaintiff's decedent asked any of the staff at Razzberries to eject Siegelman on the night of the offense. Jardine did not see the bouncer when they were leaving the bar, and she did not wait for an escort because it "was taking too long." She became anxious to leave because she noticed Siegelman becoming angrier.

Richko, the bartender, testified that Siegelman approached Jardine while she sat with plaintiff's decedent in front of his station, and asked her if she could talk to him. Jardine indicated that she was not interested in talking to him and that she just wanted to be friends.

Later in the evening Siegelman again approached her, at which time she indicated that she did not want to be bothered and that she wanted to have a drink and be left alone. Richko asked Siegelman to return to his seat and sit down, as Jardine was not interested in speaking with him. Richko told Siegelman to leave Jardine alone because she did not want anything to do with him; that she just wanted to be his friend and that he was only embarrassing himself in front of the other people. Siegelman agreed.

A short time later, Siegelman approached Jardine for a third time and began speaking to her in a much louder tone. Richko detected anger because Jardine refused to speak with him and Siegelman cursed her. He then returned to his bar stool and ordered another drink.

Siegelman next approached Jardine while she was dancing with plaintiff's decedent on the dance floor. Jardine then danced with Siegelman. Richko signaled to Andrews to watch Siegelman and Jardine to be sure that he did not become verbally or physically abusive to her.

Richko further testified that while he was mixing drinks, he saw the girls get up and put on their coats. Richko looked for Andrews to watch the women go to the car or escort them to the car because he thought there might be trouble based on the events of the night. However, Richko was unable to locate Andrews because the bar was so crowded. Richko observed Siegelman get up from the bar and walk outside.

Richko further stated that he did not believe that Seigelman posed any threat, nor was he aware that Siegelman carried a gun. Neither Jardine nor plaintiff's decedent conveyed to Richko that Seigelman had threatened either of them. Siegelman never presented

a problem prior to that night. Richko described him as "a gentleman, very happy." Richko was also unaware of any violence in Razzberries' parking lot prior to this incident.

Plaintiff's second amended complaint consisted of three counts. Only count I is at issue in this appeal. In that count, plaintiff alleged that defendant failed to protect plaintiff's decedent from attack by Siegelman when it knew or should have known that he was a threat to her safety; that Siegelman was allowed to remain within the premises when Razzberries knew or should have known that he was a threat to the safety of the patrons; and that defendant failed to take any affirmative action whatsoever to protect their patrons from the conduct or misconduct of Siegelman.

The trial court granted summary judgment in defendant's favor on count I, finding that the tavern owner did not owe a duty of care beyond the premises owned or controlled by it. Additionally, the trial court concluded that Razzberries did not voluntarily assume a duty to escort plaintiff's decedent and Jardine to the car.

Initially we note that summary judgment may be granted when the pleadings, depositions, admissions on file and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c).

Plaintiff contends that defendant owed a duty to protect plaintiff's decedent against reasonably foreseeable criminal acts of third parties occurring outside the property line used as access to the tavern. Plaintiff argues that the extent of this duty cannot be limited by unknown or unseen legal boundaries, and because defendant took commercial advantage of the use of this property, it must assume the corresponding duty to provide protection onto the property.

■ As support for his contention, plaintiff relies upon *Cooley v. Makse* (1964), 46 Ill. App. 2d 25, 196 N.E.2d 396, for the proposition that the duty of a property owner to invitees upon the premises carries with it a corollary duty to get such invitees safely on or off the premises. In *Cooley*, the court held that the defendant-owner and the proprietor of the tavern building were liable for injuries sustained by a patron when he tripped and fell on a defective brick walk, within the city's easement, in front of the tavern property. Plaintiff also cites *Smith v. Rengel* (1981), 97 Ill. App. 3d 204, 422 N.E.2d 1146, wherein the tenant's guest sustained injuries when the refrigerator he was moving fell on him when he stepped into a hole on the property adjacent to the rented premises' sidewalk. In that case, this court held that the duty owed by a landlord to tenants and their invitees and

guests extends beyond the naked and precise property lines to include means of ingress and egress. See also *McDonald v. Frontier Lanes, Inc.* (1971), 1 Ill. App. 3d 345, 272 N.E.2d 369; *Cochran v. Great Atlantic & Pacific Tea Co.* (1990), 203 Ill. App. 3d 935, 561 N.E.2d 229.

We find, however, that the distinguishing factor between the cases cited by plaintiff and the present case is that we must narrow our focus to determine whether a duty of care arises when a third party is injured through a criminal attack off the legal boundaries in an area adjoining the premises. Toward this end, we find several Illinois cases instructive.

In *Mitchell v. Archibald & Kendall, Inc.* (7th Cir. 1978), 573 F.2d 429, the court of appeals, interpreting Illinois law, held that defendant did not owe a duty to its business invitees to protect against criminal attacks by third persons while the invitee was parked on a public thoroughfare adjacent to defendant's business premises. In that case, the plaintiff, accompanied by his wife and two grandchildren, drove a truckload of produce to defendant's warehouse. Defendant's employees were already unloading a truck in the receiving dock area, and therefore, directed plaintiff to remain in his truck and park it in the area immediately opposite of its warehouse until it could be unloaded, despite their knowledge that repeated criminal acts had occurred near the premises. While plaintiff was waiting, unknown assailants accosted and attempted to rob him. When plaintiff refused to comply with the robbers' demands, he was seriously injured by a shotgun blast in the face.

Despite the affirmative conduct of defendants in instructing plaintiff to park in an area where they reasonably knew plaintiff would be in danger of criminal attack, the court in *Mitchell* held that a possessor of land is subject to liability to business invitees "while they are upon the land." *Mitchell*, 573 F.2d at 437.

■ The court held that in Illinois, the Restatement (Second) of Torts section 344 would control. That section provides in relevant part:

> "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public *while they are upon the land* for such a purpose, for physical harm caused by the accidental, negligent, or *intentionally harmful acts of third persons* \*\*\*." Restatement (Second) of Torts §344 (1965).

■ This court has also had occasion to analyze whether a tavern owner owes a duty of care to a patron who is injured outside the boundaries of the premises. In *Walton v. Spidle* (1985), 137 Ill. App.

3d 249, 484 N.E.2d 469, the plaintiff sought damages for injuries received when he was hit by a thrown brick while he was standing on the steps of a building in which defendant operated a tavern. While acknowledging the general principle that a tavern keeper has a duty to use reasonable care to protect business invitees on its premises from misconduct of third persons, this court looked for guidance to the Restatement (Second) of Torts section 314A. Comment *c* to that section provides in pertinent part:

> "A carrier is under no duty to one who has left the vehicle and ceased to be a passenger, nor is an innkeeper under a duty to a guest who is injured or endangered while he is away from the premises. Nor is a possessor of land under any such duty to one who has ceased to be an invitee." Restatement (Second) of Torts §314A, comment *c*, at 119 (1965).

Accordingly, this court held that the tavern owner owed no duty or protection to the patron at the time of his injury. Similarly, other cases, including *Badillo v. De Vivo* (1987), 161 Ill. App. 3d 596, 515 N.E.2d 681 (no duty where plaintiff attacked by third party one-half block away from defendant's property), and *St. Phillips v. O'Donnell* (1985), 137 Ill. App. 3d 639, 484 N.E.2d 1209 (operator of tavern did not have duty to protect patron, who was assaulted in common parking area by another patron who had been ejected from tavern), demonstrate this court's reluctance to extend a duty of care to patrons who are injured in incidents occurring outside the legal boundaries of the tavern.

■■ Applying these principles to the circumstances of this case, we find that defendant did not owe plaintiff's decedent a duty of care for the wrongful death which indisputably occurred 23 feet beyond the boundaries of the property owned by defendant. From the time plaintiff's decedent left defendant's legal boundaries, she was no longer owed a duty of care as a business invitee. While plaintiff makes repeated references to *Ember v. B.F.D., Inc.* (Ind. Ct. App. 1986), 490 N.E.2d 764, as support for his position that a duty should be recognized in instances when the activity involves use of the adjoining areas to defendant's commercial advantage, we find ample Illinois authority holding that a duty of care does not extend beyond the tavern owner's legal boundaries.

Plaintiff next contends that defendant assumed a duty to provide protection to the plaintiff's decedent. Specifically, plaintiff argues that Razzberries voluntarily undertook a duty to escort Jardine and plaintiff's decedent to their car on the night of the offense because of its

policy that, upon request, it provided female patrons with escorts to their cars as a courtesy.

■ The terms "misfeasance" and "nonfeasance" distinguish between not exercising reasonable care when acting, regardless of whether a duty to act exists, and not performing voluntary tasks in all instances, where there is no duty to act. Liability arises from misfeasance (*e.g., Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E.2d 769), but not from nonfeasance (*e.g., Chisolm v. Stephens* (1977), 47 Ill. App. 3d 999, 365 N.E.2d 80). In this case, defendant's conduct can be characterized only as nonfeasance because it did not voluntarily and without request escort the women from the tavern. As such, plaintiff cannot prevail on the theory of voluntary assumption of a duty. Indeed, the women left the premises without requesting an escort after the bartender's offer to provide one.

Plaintiff finally asserts that defendant had sufficient notice of the potential risk of danger to place defendant on notice of the reasonable foreseeability of a criminal attack upon Jardine and plaintiff's decedent. In *Morgan v. Dalton Management Co.* (1983), 117 Ill. App. 3d 815, 454 N.E.2d 57, this court determined that reasonable foreseeability must be judged by what was apparent to defendant at the time of the complained-of conduct, and not by what may appear through hindsight.

■ Upon review of the record, we do not find that defendant could have reasonably foreseen that Siegelman would have resorted to the drastic behavior that resulted in the death of plaintiff's decedent. We first take note of the failure of Jardine or plaintiff's decedent to alert the tavern employees that Siegelman had made threats to Jardine. While Siegelman voiced threats to Jardine, she stated in her deposition that she was not afraid that he would harm her; rather, she became aggravated and annoyed by him. Jardine also testified that Siegelman did not tell her that he had a gun, nor did she have reason to believe that he carried one.

Although Richko, the bartender, was aware that Siegelman approached Jardine on several occasions, and that the verbal exchanges became increasingly heated, we do not find that conduct sufficient for him to conclude that Siegelman was likely to become violent. Indeed, Richko stated that Siegelman never presented a problem prior to that night, and described him as a gentleman.

It is also significant that foreseeability is not the only element necessary to establish duty; the court must also consider "[t]he likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant." (*Lance*

*v. Senior* (1967), 36 Ill. 2d 516, 518, 224 N.E.2d 231, 233.) This court has repeatedly refused to require a business operator to protect its patrons from injuries that occur after the patron leaves the premises because it places an unjustifiable burden on the operator and on the police force. (*Badillo*, 161 Ill. App. 3d 596, 515 N.E.2d 681; *Walton v. Spidle*, 137 Ill. App. 3d 249, 484 N.E.2d 469; *Yangas v. Charlie Club, Inc.* (1983), 113 Ill. App. 3d 398, 447 N.E.2d 484; *Gustafson v. Mathews* (1982), 109 Ill. App. 3d 884, 441 N.E.2d 388.) Because it would obligate all business operators to police the streets so as to ensure their patrons' safe passage to their cars or even to their homes, this court has refused to extend liability to protect against assaults or altercations occurring after a patron leaves the owner's property.

For the foregoing reasons, the judgment of the circuit court of Cook County in granting summary judgment in favor of Razzberries on count I of plaintiff's complaint is affirmed.

Judgment affirmed.

EGAN and LaPORTA, JJ., concur.