JAY DAVIS, Plaintiff-Appellee, v. TOMMY ALLHANDS *et al.*, Defendants (A-Frame Lounge, Inc., Defendant-Appellant).

Fourth District    No. 4—94—0104

Argued August 17, 1994.—Opinion filed December 8, 1994.—Rehearing denied January 11, 1995.

LUND, J., dissenting.

Marc J. Ansel (argued), of Erwin, Martinkus, Cole & Ansel, Ltd., of Champaign, for appellant.

Rodney L. Smith and H. Kent Heller (argued), both of Heller, Holmes & Associates, P.C., of Mattoon, for appellee.

JUSTICE COOK delivered the opinion of the court:

Plaintiff Jay Davis sued defendant A-Frame Lounge, Inc., to recover damages resulting from a battery that occurred on defendant's premises. The jury returned a verdict in favor of plaintiff and awarded him $956,271. Following the jury's determination that plaintiff was 5% contributorily negligent, the trial court entered judgment against defendant in the amount of $908,457.45. Defendant appeals, contending (1) the evidence was insufficient to establish a duty to protect plaintiff from the criminal act of a third party because the assault was not reasonably foreseeable; (2) the trial court erred in admitting reputation evidence to prove defendant's knowledge of Allhands' violent nature; (3) defendant's negligence, if any, was not a proximate cause of plaintiff's injury; (4) Allhands' assault and plaintiff's action in voluntarily joining the fight were both superseding causes of plaintiff's injury; (5) the jury's apportionment of negligence was against the manifest weight of the evidence; and (6) the verdict was a product of passion and prejudice. We reverse.

Plaintiff testified he was 47 years old and a former self-employed carpenter for Davis Construction. On August 5, 1991, plaintiff and his nephew, Kevin Davis, went to defendant's establishment at approximately 10:30 or 11 p.m. Plaintiff had never been in the bar during open hours but had been there during the daytime. When they arrived, Steve Cannon and one of the bar's owners, Hubert Scott, were sitting at the bar and were the only persons present. Plaintiff stated he sat 8 to 10 feet from Scott and could hear Scott talk. Plaintiff had been a bouncer for 32 years and, after looking into Scott's eyes and observing Scott's difficulty getting on and off his stool, determined Scott was intoxicated. Plaintiff testified Scott drank over three or four Bud Lights while plaintiff was in the bar.

Plaintiff testified that Lisa Jenkins, a friend of Scott's who occasionally helped out at the bar, arrived around midnight. He indicated she got herself a drink and then began waiting on people. Plaintiff had one drink and started another. Tommy Allhands came in with Bobby Carson and Shelley Lucas, a young woman plaintiff described as "more dangerous than a snake." Plaintiff had removed Lucas from a bar he worked at the previous Friday night. As the three entered the bar, plaintiff stated, "Here comes trouble." Plaintiff

testified Kevin heard this comment but continued to play pool. However, Scott, according to plaintiff, responded he had seen All-hands before and Allhands had been to the bar once before and had caused no problems.

When Jenkins asked Allhands for identification, plaintiff observed Allhands give Jenkins the finger and shake his fist at her. Plaintiff had seen Allhands engage in this type of behavior before and noted Allhands had a tendency to push it to a further point than most would. After getting drinks, Allhands asked several people in the bar if they would play pool for $20. Plaintiff was not a pool player and refused, but Kevin agreed to play.

After their third game, Kevin and Allhands became loud. Plaintiff testified he heard Allhands swearing and complaining about losing. When Kevin said he was finished playing and turned to hang his cue stick on the wall, Allhands struck Kevin with a pool ball on the side of his head. Plaintiff testified Scott either sat on his stool or stood at the end of the bar until Kevin fell to the ground, when Scott ran over to the fight. Plaintiff then walked to the fight and saw Scott, kicked by Carson, fall to the floor. Lucas was also kicking Scott. Plaintiff, trying not to hurt anyone, grabbed Allhands, wrung the ball from his hands, wrestled him to the floor and placed his knee in the middle of Allhands' chest. He said, "It's over with" and "let's just forget it" to Allhands. Lucas had jumped on plaintiff's back and was biting his neck, so plaintiff flipped her. As plaintiff rose to his feet, he got hit in the face. Plaintiff nearly fell to the floor but quickly rose and punched Allhands once or twice. Plaintiff testified he then pushed his eyeball back into the socket, as it had been hanging on his cheekbone. Cannon told him the eyeball looked like nothing but blood.

Jenkins then came over and said she had called 911. Plaintiff and Kevin testified Scott said, "Call them back, tell them we don't need them. We don't need the shit." Allhands and his companions left the bar. Kevin then took plaintiff to the hospital.

Kevin testified he had been to the A-Frame 10 to 12 times prior to the night of August 5, 1991. When he and plaintiff arrived that night, Kevin sat next to Cannon and plaintiff sat next to him. Kevin noticed Scott was drinking a Bud Light and determined Scott was intoxicated, based upon his slurred speech and the fact that he staggered a bit when he walked. Kevin testified he said to Scott, "[L]ooks like you're in fine form today," to which Scott replied, "I've been at it all day." Kevin saw Jenkins come in and noticed she was drinking a beer.

Kevin sat at the bar for 30 minutes, then played two games of

pool with his friend Shane Gastin. He observed Allhands, a guy and a young woman enter the bar and noticed Scott was behind the bar when they arrived. He testified Allhands threw his wallet and driver's license on the bar in response to Jenkins' request for identification. However, Kevin stated Allhands seemed friendly enough, and he and Allhands ultimately agreed to play pool for $5.

Kevin quickly won the first two games. He believed Allhands was intoxicated because he slurred his speech and tripped over the pool table once, "staggering hard." Allhands had two beers and a shot of liquor while they were playing pool. After losing the second game, Allhands threw money on the pool table. Kevin then intentionally lost the third game because Allhands "acted like he wanted to fight or something and I didn't want no part of it." Kevin acknowledged plaintiff knew of Kevin's prior involvement in at least two bar fights. Kevin and Allhands exchanged words over who would win if they should play in the future, and Kevin stated Allhands got in his face. As Kevin turned to hang his cue up, he felt something hit him in the back of the head, and he fell down. Kevin testified Scott then ran back to the fight, yelling "[H]elp me get them apart." Plaintiff pulled Allhands off Kevin; Carson then ran over and began kicking Kevin in the side. Kevin's ex-wife, Crystal Wagner, came over and told Kevin to calm down. As plaintiff rose to his feet, Allhands wriggled out from under him, picked up a cue stick from the floor, and swung it like a baseball bat at plaintiff. Kevin yelled "Look out, Jay Dee!" and lunged forward, but he was too late. The stick hit plaintiff across the forehead and in his left eye. Kevin hit Allhands three or four times and then Allhands, along with Carson and Lucas, ran out of the bar.

Emery Johnson owned 50% of the A-Frame Lounge as of August 1991. Two to three months after the A-Frame opened, Johnson had called the police during a fight; he testified Scott told him he should not have done so because it would "just cause more problems." Johnson testified he talked with Jenkins a week after the fight in question and she said Scott had had quite a bit to drink that night. Johnson stated Scott came to his used car lot on the morning of August 6, 1991, to tell him about the events of the night before. At that time, Scott told Johnson he knew Allhands because Allhands had been in there before. Johnson then admitted Scott did not know Allhands personally, but merely knew who he was. At the time of trial, Johnson was a plaintiff in a lawsuit against A-Frame, and he admitted he had been convicted of theft by deception in April 1991.

Steve Cannon had known plaintiff since his childhood. He testified he heard plaintiff say "here comes trouble." When Cannon

had asked what he meant, plaintiff had stated Allhands was barred from about every place in the county. Cannon did not think plaintiff's comment was directed at Scott, as he and plaintiff had been talking all evening and Scott had not been involved in any of their conversations. Cannon did not know Allhands and was surprised at plaintiff's comments, because Allhands did not look like a trouble-maker. He did not notice any yelling or commotion coming from the pool table before the fight. He stated he missed the fight because he went to the men's room, which plaintiff corroborated. He remembered Scott had a glass of something to drink, but he was not sure what was in it. He did not remember that Scott was drunk.

Crystal Wagner testified that when she and a friend arrived at the A-Frame around midnight or 12:30 a.m., Kevin and Allhands were playing pool. After the game was over, the two men argued over who had won. At that point, plaintiff and Scott went over to the pool table to tell Kevin and Allhands to keep their voices down. Suddenly, plaintiff was trying to hold Allhands down, and Scott was holding Kevin. Wagner did not see the injury; she only saw plaintiff walking through the bar looking for a rag after it had happened. She stated the fight began not more than 25 minutes after she arrived at the bar. She presumed from the volume of Allhands' voice that he had been drinking.

Lisa Jenkins testified she went to the A-Frame two to three times a week to drink, play pool, listen to the jukebox, and help out once in a while. When she helped out, she would wipe off tables, empty ashtrays, stock the cooler, and serve drinks. On the night in question, she arrived at the bar between 9 and 10 p.m. She immediately paid for and got herself a beer, and she admitted she had three or four over the course of the evening. She testified Scott was drinking either coffee or Pepsi and did not act intoxicated. She denied telling Emery Johnson that Scott was so intoxicated he had trouble remaining on his stool or that Allhands had been in the bar before. She knew plaintiff prior to that night but had only seen Kevin once or twice and was not aware of his prior involvement in bar fights. She believed plaintiff and Scott were sitting close enough to converse.

Allhands swore, got cocky, and gave her the finger when she carded him. When asked if Allhands had said, "Take it and shove it" and "up yours, old man," Jenkins admitted he "probably said things to that effect." However, when Jenkins told Scott about the incident, she indicated it was probably no big deal. She said the thought of violence entered her mind for a moment and then was gone. She had no indication Allhands had been drinking when he arrived.

When the fight began, Jenkins thought Scott was standing next

to her, in the same spot he had been all night. Plaintiff went over to break up the fight; Jenkins saw pool cues in the air and believed that was when Scott went over. Before that, Scott "stood up and stepped around, but at first he thought it was under control." After Scott went over and fell to the floor, Jenkins called 911. She was on the phone for perhaps 30 to 45 seconds; before she hung up the phone, Jenkins observed Allhands and his companions leave and said to the operator, "Well, never mind, they're gone." She was unsure whether anyone had told her to tell the police it was not necessary for them to come. Jenkins estimated the amount of time which elapsed between the start of the fight and plaintiff's approach to it was "seconds," although in her January 1993 deposition, she had said it was between three and five minutes.

Hubert Scott testified he presumed Allhands had been drinking prior to arriving at the A-Frame, but he had formed no opinion as to Allhands' intoxication. He admitted he paid Jenkins for her work through free beer but denied she had had three to four beers on the night of August 5, 1991. He also admitted there had been four fights in the bar since it had opened in May 1991. Although he remembered Allhands ordered a Budweiser, Scott could not recall what Allhands looked like. Once Jenkins informed him Allhands had given her the finger when she carded him, Scott looked at Allhands; at that point, Allhands was acting normally and did not appear intoxicated.

Scott testified approximately 20 minutes elapsed between Allhands' arrival and the beginning of the fight. Scott missed the beginning of the fight because he went to the back room to get ice. As he was returning from the back room, he heard hollering and saw plaintiff heading over to the fight. He thought plaintiff was going back to break up the fight. Scott estimated about 30 seconds elapsed before he saw Allhands and Kevin rolling around on the floor. When Scott went over to the fight, plaintiff had blood on his face and was on the floor with Allhands. Scott stated he fell to the floor after Allhands hit him with a pool cue. He then saw Allhands hit plaintiff with the cue. After Allhands left, Scott called the police and told them Allhands had gone and offered a description of the vehicle.

Scott denied having any alcohol that evening, and his wife, Sue, who at the time of trial owned the other 50% interest in A-Frame, testified he had had nothing to drink before he left home to go to the bar. Rosalee Scaggs, who called Scott and asked him to take over her shift that night, testified Scott did not appear to have had any alcoholic beverages when she saw him. Brian Obenland, who had known Scott for four or five years and went to the bar to get cigarettes at about 8:30 p.m., offered similar testimony.

Scott denied knowing Kevin before that evening and denied knowing Kevin's reputation for fighting. He also denied hearing plaintiff make any comment when Allhands walked in and denied making any comment to plaintiff regarding his prior knowledge of Allhands. Scott testified Allhands had never been in the bar before. He denied telling Johnson that Allhands had been in the bar before and denied telling anyone that evening not to call the police. Although he indicated lots of people do not like to be carded, Scott admitted this was the first time someone had given the finger in response to being carded.

Vermilion County Sheriff Jerry Davis stated in an offer of proof that he had spoken to approximately 200 people regarding Allhands' reputation and had read several newspaper accounts of Allhands' involvement with the police. Allhands was known as a fighter and had threatened force using a firearm, a stick, his fists and his feet. Davis stated he thought most tavern owners in Vermilion County, as of 1991, would know Allhands' name and indicated Allhands had been barred from certain taverns on three or four occasions. The only testimony the trial court allowed before the jury was Davis' statement that Allhands was not a peaceful and law-abiding citizen and was known as a troublemaker, a fighter, and a thief.

Plaintiff testified that after the fight the pain in his left eye was excruciating, and he initially thought he had been shot. Doctors sewed up plaintiff's left eyeball and told him he had sustained a one-half-inch tear. In mid-September 1991, plaintiff was told he had suffered traumatic damage which had totally destroyed the interior of the eyeball. As the pain remained excruciating, plaintiff later had the eyeball removed. The pain thereafter lessened, but plaintiff no longer has peripheral vision, can no longer read, is nervous about driving, and occasionally experiences "phantom pains," wherein he feels pain in his left eye although he no longer has an eye. Plaintiff has done no carpentry since the injury.

At the close of plaintiff's evidence, defendant moved for a directed verdict, which was denied. Following the entry of judgment for plaintiff, defendant filed a post-trial motion, which was denied. This appeal followed.

■ To recover in a negligence action, a plaintiff must establish that the defendant owes plaintiff a duty, has breached that duty, and that plaintiff has been injured as a proximate result of defendant's breach of duty. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226; *Costa v. Gleason* (1993), 256 Ill. App. 3d 150, 151, 628 N.E.2d 199, 200; *Lucht v. Stage 2, Inc.* (1992), 239 Ill. App. 3d 679, 683, 606 N.E.2d 750, 753.) Whether under the facts of a case there is

a relationship between the parties as to require that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court. (*Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215, 531 N.E.2d 1358, 1364 (landlord assumed duty by retaining access to individual office units and making keys); *Vesey v. Chicago Housing Authority* (1991), 145 Ill. 2d 404, 411, 583 N.E.2d 538, 541; *Ziemba v. Mierzwa* (1991), 142 Ill. 2d 42, 47, 566 N.E.2d 1365, 1366 (imposition of a general duty to anticipate negligence of others would impose an intolerable burden); *Loomis v. Granny's Rocker Nite Club* (1993), 250 Ill. App. 3d 753, 755, 620 N.E.2d 664, 665-66.) The question whether a legal duty exists is contingent upon a variety of factors, and the weight accorded each factor depends upon the circumstances of each case. (*O'Hara v. Holy Cross Hospital* (1990), 137 Ill. 2d 332, 339, 561 N.E.2d 18, 21.) A tavern operator's duty of reasonable care cannot be extended to a duty to protect against the criminal attacks of third persons unless circumstances such as prior incidents charge the operator with knowledge of the danger. (*Lutz v. Goodlife Entertainment, Inc.* (1990), 208 Ill. App. 3d 565, 570-71, 567 N.E.2d 477, 481.) In determining whether there is a duty in these cases, it is for the court to determine, as a matter of law, whether the criminal attack is reasonably foreseeable, and to weigh the various policy considerations. *Loomis*, 250 Ill. App. 3d at 755, 620 N.E.2d at 665-66; *Nakis v. Amabile* (1981), 103 Ill. App. 3d 840, 844, 431 N.E.2d 1255, 1258.

Plaintiff argued before the jury that the following omissions made Allhands' assault reasonably foreseeable and therefore subjected defendant to liability: (1) defendant's failure to provide additional security, given evidence that four fights occurred in the first 90 days the bar was open; (2) Scott's failure to exclude Allhands, given evidence of Allhands' intoxication and his reputation in the community; and (3) Scott's alleged intoxication and his failure to adequately respond once the fight broke out.

Initially, we note that reasonable foreseeability must be judged by what was apparent to defendant at the time of the complained-of conduct, and not by what may appear through hindsight. (*Lewis v. Razzberries, Inc.* (1991), 222 Ill. App. 3d 843, 851, 584 N.E.2d 437, 442 (summary judgment for defendant affirmed where decedent not afraid she would be harmed even though bartender was aware exchanges became increasingly heated).) " 'Foreseeability' means that which it is objectively reasonable to expect, not merely what might conceivably occur." *Benner v. Bell* (1992), 236 Ill. App. 3d 761, 766, 602 N.E.2d 896, 899, citing *American National Bank & Trust Co. v. National Advertising Co.* (1992), 149 Ill. 2d 14, 29, 594 N.E.2d 313, 320.

## I. WAS THERE A DUTY TO PROVIDE ADDITIONAL SECURITY?

■ A history of problems involving others than the aggressor may give rise to a duty to provide security personnel (*Yangas v. Charlie Club, Inc.* (1983), 113 Ill. App. 3d 398, 404, 447 N.E.2d 484, 489; see *Lutz*, 208 Ill. App. 3d at 571, 567 N.E.2d at 481), but it provides no indication a specific individual not involved in previous altercations should be denied admittance or ejected. A history of problems at a tavern (a fight, sales to minors) was held not to constitute notice of danger as a matter of law in *Mealy v. Pittman* (1990), 202 Ill. App. 3d 771, 776, 559 N.E.2d 1173, 1176.

■ In the present case, the record indicates only that there had been four fights during the first 90 days the tavern had been open. There is no indication that any of those fights involved more than a scuffle, that they were not immediately handled by employees of the tavern, or that Allhands was involved in any of them. At oral argument, plaintiff asserted that he had attempted to introduce evidence concerning the nature of those four fights but, following defendant's objection, the trial court refused to admit such evidence. The record indicates only that defendant had submitted a motion *in limine* requesting the trial court refuse all references to prior fights at the bar. The trial court denied this motion, indicating it needed to understand the purpose for which such evidence was being offered and would reserve its decision until the matter arose at trial. No evidence concerning these four fights was ever adduced at trial. The evidence in this case discloses nothing which can be said to have imposed on defendant the duty to employ additional security personnel.

## II. WAS THERE A DUTY TO EXCLUDE ALLHANDS FROM THE BAR?

■ A tavern operator is not an insurer of its patrons' safety. (*Lucht*, 239 Ill. App. 3d at 687, 606 N.E.2d at 755-56; *Badillo v. DeVivo* (1987), 161 Ill. App. 3d 596, 598, 515 N.E.2d 681, 683.) Although a tavern operator has a duty to protect its patrons from foreseeable dangers caused by third parties (*Lucht*, 239 Ill. App. 3d at 684-85, 606 N.E.2d at 754; *Lutz*, 208 Ill. App. 3d at 569, 567 N.E.2d at 479-80; *Badillo*, 161 Ill. App. 3d at 598, 515 N.E.2d at 683), there is no duty to protect against the criminal attacks of third persons unless circumstances such as prior incidents charge the owner or occupier of land with knowledge of the danger. (*Lutz*, 208 Ill. App. 3d at 570-71, 567 N.E.2d at 481.) All the cases we have reviewed have required actual knowledge of the danger. See *Lucht*, 239 Ill. App. 3d at 687, 606

N.E.2d at 755 (damages award to plaintiff affirmed where tavern's security guards knew assailant's reputation as troublemaker, had witnessed confrontation between parties earlier that night, and were told assailant would start fight that evening); *Lutz*, 208 Ill. App. 3d at 571, 567 N.E.2d at 481 (summary judgment affirmed where assailant had not displayed any prior aggression or hostility and defendant had no knowledge of assailant's involvement in any prior altercations at tavern); *Yangas*, 113 Ill. App. 3d at 401-02, 447 N.E.2d at 487-88 (defendant's knowledge limited to that possessed by employees; directed verdict affirmed where no prior incidents involving aggressor and no knowledge of aggressor's violent or dangerous nature).

■ Plaintiff argued at trial that defendant, via Scott, knew or should have known of Allhands' reputation as a troublemaker, citing the testimony of Officer Davis, Emery Johnson, and plaintiff's statement, "here comes trouble." Therefore, according to plaintiff, Scott should have excluded Allhands from the tavern. Despite Officer Davis' testimony concerning Allhands' reputation in the community, Scott denied knowing Allhands or his reputation and denied hearing plaintiff say "here comes trouble." Emery Johnson admitted Scott had merely seen Allhands before and accordingly knew who he was. Steve Cannon testified he did not think Scott heard plaintiff's comment because Scott had not been engaged in the conversation between Cannon and plaintiff. The idea that Allhands was "trouble" is somewhat refuted by the fact that plaintiff, who knew Allhands well, remained in the bar after Allhands entered and allowed his nephew, Kevin, to play pool with him. Even assuming defendant had a duty to protect or warn other individuals, defendant had no such duty to plaintiff, who was experienced in these matters and knew Allhands very well. "Sometimes the defendant will be free to assume that when a third person becomes aware of the danger, and is in a position to deal with it, the third person will act reasonably." W. Keeton, Prosser & Keeton on Torts § 44, at 313 (5th ed. 1984).

There is no evidence in the record that Scott knew or should have known of Allhands' reputation. We are unwilling to impose a duty upon tavern owners to inquire in the community about the character of potential patrons for violence. Such a duty is not justified by " '[t]he likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant.' " *Lewis*, 222 Ill. App. 3d at 851, 584 N.E.2d at 442, quoting *Lance v. Senior* (1967), 36 Ill. 2d 516, 518, 224 N.E.2d 231, 233; see also *Yangas*, 113 Ill. App. 3d at 403, 447 N.E.2d at 488.

Even if Allhands were intoxicated, that fact did not give rise to a duty to exclude him. The fact that intoxicated drivers are generally

more likely to be involved in traffic accidents does not mean a reasonably prudent person would have foreseen as likely the improper operation of a vehicle where a patron denied entrance to a tavern later used his automobile to plow into plaintiff in the parking lot. (*Yangas*, 113 Ill. App. 3d at 403, 447 N.E.2d at 488; *cf. Lutz*, 208 Ill. App. 3d at 571, 567 N.E.2d at 481 (if there was evidence that assailant was intoxicated, that evidence might weigh against summary judgment).) It would seem more likely that intoxication would lead to an accident than to an assault. Knowledge of an aggressor's intoxication, and knowledge that the aggressor may have given the employees some "back talk," has been held not sufficient to give rise to a duty to take affirmative action to protect a tavern's patrons. (*Yangas*, 113 Ill. App. 3d at 401-02, 447 N.E.2d at 487.) Knowledge that patrons are members of a motorcycle gang and are carrying buck knives does not give rise to a duty on a tavern owner to exclude those patrons. (*Getson v. Edifice Lounge, Inc.* (1983), 117 Ill. App. 3d 707, 712, 453 N.E.2d 131, 135.) The fact that one patron was physically assaulted by another in a tavern, after which both were ejected, did not give rise to any duty to further protect the patron. (*Badillo*, 161 Ill. App. 3d at 598, 515 N.E.2d at 683.) Evidence of All-hands' intoxication, in the facts of this case, was not sufficient to impose on defendant a duty to eject him from the bar.

### III. DID DEFENDANT VIA SCOTT ADEQUATELY RESPOND TO THE FIGHT?

■ A tavern operator has the duty to act reasonably to protect his patrons once a fight begins, but it is significant that the fight is over quickly. (*Getson*, 117 Ill. App. 3d at 713, 453 N.E.2d at 135 (no duty imposed where fight lasted less than one minute); *cf. Loomis*, 250 Ill. App. 3d at 759, 620 N.E.2d at 668 (duty imposed where fight lasted several minutes without intervention by defendant).) In *Getson*, it was sufficient that the operator instructed his doorman not to let anyone in or out of the bar (the fight took place outside the tavern), and, after another patron was threatened, called the police. In order to invoke a duty it is also necessary that the tavern owner or operator is aware of the altercation. (*Nakis*, 103 Ill. App. 3d at 844, 431 N.E.2d at 1258 (no duty found where plaintiff failed to yell out for help or assistance and offered no evidence of other shouting or yelling which might have alerted bouncers).) The record indicates Scott was quickly aware of the fight and responded by attempting to intervene. Plaintiff testified Scott responded to the fight before plaintiff did. When Scott was knocked to the floor, Lisa Jenkins called 911 for assistance. Even if Scott were intoxicated, there was no evidence he responded unreasonably to the fight.

It is unusual for one person to be held responsible for the independent criminal acts of another. A tavern operator is not so responsible unless the evidence shows circumstances sufficient to charge the operator with knowledge of danger. No such circumstances have been shown here. Because we hold the evidence was insufficient to establish a duty to protect plaintiff from Allhands' conduct in this case, we need not discuss defendant's other arguments.

For the foregoing reasons, the judgment of the circuit court of Vermilion County is reversed.

Reversed.

GREEN, J., concurs.

JUSTICE LUND, dissenting:

The majority recognizes that there is an exception to the exclusive liability created by the Dramshop Act (Ill. Rev. Stat. 1991, ch. 43, par. 135). That exception allows negligence action against dramshop owners, where an invitee is injured by the wrongful acts of another and the owner did not act reasonably in preventing the assault. However, duty creating the cause of action only exists where the wrongful conduct was foreseeable. (*Boyd v. Racine Currency Exchange, Inc.* (1973), 56 Ill. 2d 95, 97, 306 N.E.2d 39, 41.) The *Boyd* opinion also stated foreseeability alone does not result in the imposition of a duty; the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing the burden upon the defendant must also be taken into account. *Boyd,* 56 Ill. 2d at 99, 306 N.E.2d at 41-42, citing *Lance v. Senior* (1967), 36 Ill. 2d 516, 518, 224 N.E.2d 231, 233.

Opinions of the Illinois Appellate and Supreme Courts fail to provide guidelines as to when a foreseeability duty exists (or does not exist) as a matter of law, because each case is limited by its own facts. (See *Lutz,* 208 Ill. App. 3d 565, 567 N.E.2d 477; *Yangas,* 113 Ill. App. 3d 398, 447 N.E.2d 484; *Lewis,* 222 Ill. App. 3d 843, 584 N.E.2d 437; *Loomis,* 250 Ill. App. 3d 753, 620 N.E.2d 664.) Textbooks are of little assistance. See 45 Am. Jur. 2d *Intoxicating Liquors* § 557 (1969 & Supp. 1994).

The cited decisions all recognize that the dramshop owners owe a duty to protect invitees from foreseeable dangers by others. If there is such a duty, then it appears axiomatic that the owner (or owners) must be in a condition to recognize something that is foreseeable.

The jury in this case could find from the evidence that (1) Allhands was intoxicated and abusive when he entered the bar; (2) the

warning, "here comes trouble," by plaintiff should have been heard by Scott; (3) Scott was aware of earlier fighting in the bar; (4) Scott was intoxicated; and (5) Allhands' prior conduct toward Lisa Jenkins, coupled with Allhands' continued drinking, his asking for $20 pool games, and plaintiff's earlier warning, should have caused Scott to be aware of the danger.

The evidence presented sustains a finding that the bar owner should have foreseen danger from Allhands. If danger was foreseeable, then a duty to protect the invitees existed. Scott's intoxication should never be allowed as an excuse. Plaintiff's conduct in trying to stop Allhands from pounding Kevin's head with a pool ball can hardly be considered inappropriate or not anticipated.

Appropriate to this dissent, and in this case, is the following quotation:

> "Frequently foreseeability is no more than a convenient formula by which a court disposes of an otherwise intractable case; in such situations foreseeability is treated as a question of law. The court may say that foreseeability is for the jury, but decides the issue itself because varying inferences are not possible. *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99, 101 (1928).
>
> In general, courts appear confused whether the issue of foreseeability is one for the court or the jury. They also seem reluctant to relinquish the power that foreseeability gives them over the disposition of the case." Hardie, *Confronting Foreseeability in Products Litigation*, For the Defense, Vol. 36 (October 1994), at 8-9.

There was hesitation about the use of this article printed in a magazine for defense counsel. However, those few reading this dissent should not be concerned. Appellate judges receive, without solicitation, State and National magazines published for both plaintiff's counsel and defense counsel. Bias, then, is equally weighed.