2023 IL App (1st) 221276-U
No. 1-22-1276
Order filed March 27, 2023

First Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| JUAN FLORES, YOMARY FLORES, AUGUSTO MONTIJO, and DANIEL ELLISTON,<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>ZIEMEK CORPORATION, INC., d/b/a ZARCHARY'S FOR COCKTAILS; HAL STEINKE a/k/a HD STEINKE; ROBERT P. MCELROY and ELIZABETH Z. MCELROY, individually and as Trustees of McElroy Family Trust Dated February 7, 1992,<br><br>Defendants-Appellees. | Appeal from the<br>Circuit Court of<br>Cook County.<br><br>No. 19 L 5458<br><br>Honorable<br>Gerald V. Cleary,<br>Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Summary judgment affirmed on premises liability claims in the absence of evidence plaintiffs were invitees, criminal conduct was reasonably foreseeable, and property owners had control of premises they leased.

¶ 2    Plaintiffs were injured when shot by a member of a rival motorcycle club outside a bar.

Plaintiffs sued the owners of the bar and the property owners, alleging premises liability. The

trial court granted the defendants' motion for summary judgment. The court found that because two plaintiffs were never in the bar and had no intention of going inside and the third plaintiff had left the bar with no intention of returning, they were not invitees and had no "special relationship" with the bar owner giving rise to liability. Further, the court found the shooting was not reasonably foreseeable, merely because the bar was open late and served intoxicated patrons, some members of motorcycle clubs. And the court found no special relationship between the property owner and the bar owner.

¶ 3        Plaintiffs contend the trial court erred in granting summary judgment for defendants because (i) the bar was open to the public and the shooting occurred in a designated smoking area in front of the bar, creating a special relationship between plaintiffs and defendants; (ii) the shooting was reasonably foreseeable because the bar was open late at night, served intoxicated customers, and had no security; and (iii) a question of fact exists on whether the property owner had control over the bar.

¶ 4        We affirm. The shooting was not reasonably foreseeable without evidence showing a prior altercation between plaintiffs and defendants. Further, the evidence did not show the property owners exercised control over the bar.

¶ 5                                    Background

¶ 6        Zachary's for Cocktails, a bar, was owned by defendant Hal Steinke through Ziemek Corporation, Inc. Ziemek leased the building from defendants Robert and Elizabeth McElroy, who owned the property through a family trust. Robert McElroy testified by deposition that he and Ziemek entered into a written lease between 2000 and 2010 but had since operated on a month-to-month basis. McElroy said that as landlord, he maintains the premises and makes

necessary repairs, but he and his wife have never been involved in the ownership or operation of the bar.

¶ 7        Daniel Elliston testified by deposition that he arrived at Zachary's at about 3:00 a.m. (Zachary's liquor license allowed it to remain open until 5:00 a.m. on weekends.) Elliston belonged to the Night Keepers motorcycle club, a "support club" of the Outlaws motorcycle club. Elliston was wearing a vest with both clubs' logos. When Elliston went into the bar, he saw several patrons wearing vests identifying themselves as members of the American Knights, a law enforcement affiliated motorcycle club. Elliston testified that the Night Keepers and Outlaws were not adversaries of the American Knights but acknowledged they "weren't friendly."

¶ 8        Elliston stood at the bar talking to two women when Steve Ticinovic ordered drinks. Elliston and Ticinovic had a brief conversation. Both men described the conversation as nothing out of the ordinary. Ticinovic bought Elliston a beer and returned to his table with members of the American Knights. (Ticinovic was a member of a motorcycle club affiliated with the American Knights.)

¶ 9        A short time later, Elliston went to use the bathroom and passed the table with Ticinovic and five or six other people, including Sean Najm, an off-duty Chicago police officer. Najm acknowledged in his deposition that he and the men at his table were affiliated with the American Knights, and he was wearing a vest with the club's logo.

¶ 10        According to Elliston, the men at the table stared him down when he walked past. While in the bathroom, Elliston heard someone at the table call him an "Outlaw Bitch." Elliston said he became concerned for his safety and called a friend, Henry Rodriguez, for a ride. Elliston testified that he had a car but did not think he should drive because he had been drinking.

¶ 11    Elliston left the bathroom without speaking to anyone and walked outside to smoke a cigarette at a designated smoking area outside the bar's front door. He had been there earlier and decided to wait there for Rodriguez. When Elliston left the bar, he had no intention of returning inside.

¶ 12    After receiving Elliston's call, Rodriguez, Juan Flores, Augusto Montijo, and Nurberto Ramos drove to the bar. (Rodriguez and Ramos are not parties.) Rodriguez, Flores, and Montijo were purportedly members of the Twisted Image motorcycle club, which, like Elliston's club, was allied with the Outlaws. After parking, the men walked toward the bar. After exchanging greetings with the four men, Elliston saw the American Knights, including Ticonovic, walking out. Elliston said to them, "Who's the Outlaw bitch now?" A fight immediately broke out. Someone stabbed Ticonovic, who, armed with a gun, shot Elliston, Flores, and Montijo, seriously injuring them. (Ticonovic had a conceal carry license. The State's Attorney determined he acted in self-defense and did not charge him with gun-related crimes.)

¶ 13    Plaintiffs filed a complaint against defendants, alleging premises liability as well as loss of consortium, on behalf of Juan Flores's wife, Yomary Flores. Plaintiffs alleged defendants were liable for negligently failing to (i) provide adequate security to protect patrons; (ii) train its employees to properly deescalate violent confrontations and notify law enforcement; (iii) ensure firearms were not brought inside; and (iv) warn the public, including the plaintiffs, of the dangerous condition on the premises.

¶ 14    After discovery, defendants filed a motion for summary judgment. Plaintiffs filed a response, attaching depositions and affidavits, including a deposition from Andrew Miller, a bartender. Miller testified that physical fights occurred at the bar about once a year, but never

witnessed a shooting. He said he had to call the police on two or three occasions during nearly 10 years. He said the bar sometimes had security at the door, primarily to check IDs, but no employee worked security that night.

¶ 15    Plaintiffs also attached a report from security expert William Marcisz, who opined that the shooting was reasonably foreseeable because Zachary's is a late night bar that caters to intoxicated patrons, including motorcycle club members, and lacked security measures needed to address the inherent risks to bar patrons. Specifically, Marcisz opined that Zachary's was negligent for failing to (i) install closed circuit cameras; (ii) hire and train security staff, (iii) develop security processes, (iv) prevent patrons from bringing weapons into the bar, and (v) warn patrons, including plaintiffs, of the dangerous conditions inside the bar.

¶ 16    After briefing and a hearing, the trial court granted summary judgment for defendants and, after plaintiffs settled with Ticinovic, dismissed their complaint with prejudice. The court agreed with plaintiffs that the fight happened outside the bar near a designated smoking area. But the court found that the deposition testimony showed that Flores and Montijo arrived to pick up Elliston with no intention of going inside the bar and that Elliston left the bar with no intention of returning. Thus, plaintiffs were not invitees, and defendants did not have an affirmative duty to protect them against an unreasonable risk of physical harm.

¶ 17    The court also concluded the shooting was not reasonably foreseeable. The court found no evidence that the bartender had information or knowledge of an "interaction or criminal activity between Ticinovic and the plaintiffs." The court noted that the bartender testified about "some incidences outside the bar many years before" and that the police were called perhaps once a year. Further, nothing happened immediately before this incident to put Zachary's on notice of a potential problem between plaintiffs and defendants or any criminal conduct.

¶ 18    The court found plaintiffs' expert report "insufficient" to establish foreseeability. The court noted that Zachary's status as a late-night bar with intoxicated patrons, some of whom may be wearing motorcycle club clothing, was not indicative of reasonable foreseeability of a crime. The court noted that the expert tried but failed to find police reports showing interactions between motorcycle clubs or clubs of any type outside or inside the bar. "The only information from other incidences were isolated simple batteries that occurred outside the bar, and there is no information as to where outside the bar, where on the sidewalk, or what relationship it had—those people had with Zachary's." So, the court found "insufficient evidence to create a question of fact that it was reasonably foreseeable to Zachary's that this incident would occur." The court's holding also applied to the property owners because no evidence established a special relationship between "the owner of the property and who was it was demised to."

¶ 19                                    Analysis

¶ 20                              Standard of Review

¶ 21    Summary judgment applies where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). The court construes the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). Summary judgment should be granted where the right of the movant is clear and free from doubt. *Id.* We review the trial court's grant of summary judgment *de novo*. *Argonaut Midwest Insurance Co. v. Morales*, 2014 IL App (1st) 130745, ¶ 14.

¶ 22                              Special Relationship

¶ 23      Ordinarily, a possessor of land owes no duty to protect lawful entrants from criminal attacks by third parties. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 243 (2000). But certain special relationships, including that between a business invitor and invitee, can give rise to an affirmative duty to protect another against an unreasonable risk of physical harm, including harm caused by a third party's innocent, negligent, intentional, or criminal misconduct. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 438-39 (2006) (citing Restatement (Second) of Torts § 314A, cmt. D § 344 (1965)). One reason for recognizing the special relationship of business invitor and invitee is that, generally, "commercial establishments are well positioned 'to know the extent of crime on the premises *** to take measures to thwart it and to distribute the costs' associated with providing security." *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 245 (2000) (quoting *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 903 (Tenn. 1996)).

¶ 24      Generally, a business invitee ceases to be an invitee, and the business invitor's duty ends when the invitee leaves the premises owned by the invitor. See *Lewis v. Razzberries, Inc.*, 222 Ill. App. 3d 843, 850 (1991) (holding that tavern owner did not owe patron a duty of care for wrongful death that occurred 23 feet beyond boundary of tavern owner's property because patron was no longer invitee). But this court has recognized exceptions to the general rule that a bar owner's duty to protect its patrons from criminal acts of third parties ends at the bar's property line. In *Shortall v. Hawkeye's Bar & Grill*, 283 Ill. App. 3d 439 (1996), the appellate court reversed summary judgment in favor of the bar, holding that the bar might have had a duty to protect the plaintiff from the stabbing by a third party that occurred 15 minutes after the plaintiff left the bar to go to his car about 60 feet from the bar's property. *Id.* at 441. The court reasoned that the bar "was under the same duty as if the fight had occurred inside the

bar" because the dispute eventually led to a fight in the bar, which the bar escalated by ushering some patrons outside into the fight, while the bar's bouncers watched the fight through a window and did nothing. *Id.* at 444. The appellate court said, "tavern owners may not avoid application of the duty to act to protect invitees from criminal attack by third parties simply because the disturbance giving rise to the duty occurs just out the front door, especially where the owner contributes to the altercation by sending patrons out into it." *Id.* at 444.

¶ 25 Similarly, the patron of a nightclub was criminally attacked by another patron on the sidewalk in front of a nightclub in *Osborne v. Stages Music Hall, Inc.*, 312 Ill. App. 3d 14, 145 (2000). The trial court directed a verdict in favor of the nightclub, ruling it owed no duty to the plaintiff since the incident occurred on the sidewalk and the attacker's actions were not reasonably foreseeable. *Id.* at 146. The appellate court reversed and remanded, holding "[w]hether the assault takes place in or outside the actual premises of the business owner, the dispositive factor remains the reasonable foreseeability of the actions taken by the third party." *Id.* at 148. Earlier that evening, the nightclub's bouncers ejected two drunk men and locked the doors behind them. *Id.* at 143-44. The men pounded on the doors and yelled profanities at the bouncers. *Id.* When the plaintiff and a friend walked out of the nightclub, one of the men slapped the plaintiff's friend, and when plaintiff approached her friend, one of the men kicked her in the face. *Id.* at 145.

¶ 26 The *Osborne* court found the attack was reasonably foreseeable—ample evidence showed the bouncers knew that the men outside were drunk and angry, had already been involved in a fight inside, and had not cooled off after being evicted. *Id.* at 149. The court also reasoned that the bouncers did not remove the men from the sidewalk or otherwise police the area, even though the club had controlled the sidewalk area earlier that evening. "The bouncers exported

the club's problems to the sidewalk and then ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of potentially dangerous men." *Id*. The court relied on *Shortall*, among other cases, in concluding that the attack on sidewalk just outside the club did not dispose of the duty issue. *Id*. at 148.

¶ 27     Similarly, in *Haupt v. Sharkey*, 358 Ill. App. 3d 212 (2005), the appellate court held that a tavern could be liable for a criminal attack against one of its patrons just off the tavern's premises in the parking area owned by the county. *Id*. at 219. The court concluded, "there is no bright line rule that a tavern owner's duty to protect its patrons from criminal acts of third parties absolutely ends at the precise property line of the tavern. *Id*. at 218. The court held that a tavern's duty "to provide a reasonably safe means of ingress and egress to patrons," coupled with the foreseeability of the criminal attack that occurred as the patron was evicted from the tavern, precluded summary judgment in the tavern's favor. *Id*. at 219-220.

¶ 28     Relying on *Hills*, *Haupt*, *Osborne*, and similar cases, plaintiffs contend they were invitees of Zachary's due to the shooting having occurred immediately outside the bar's entrance in a designated smoking area open to the public and intended to attract customers or keep existing customers at the bar. Plaintiffs assert that, at minimum, the location of the fight creates a question of fact as to whether they were invitees to whom defendants had an affirmative duty to protect them against an unreasonable risk of physical harm, including by a third party.

¶ 29     The cases cited by plaintiffs involved parties injured after leaving a bar or nightclub they patronized. Plaintiffs Flores and Montijo were never inside Zachary's and had no intention of going inside. Thus, we agree with the trial court that they were not invitees. Plaintiffs contend they all were invitees because Zachary's was open to the public for business. But they cite no cases, and we could find none so holding.

¶ 30        We agree, however, that as to Elliston, a question of fact exists as to whether he was an invitee when he left the bar and stood in its smoking area waiting for a ride. But, as noted, no duty exists unless the criminal attack was reasonably foreseeable (*Haupt,* 358 Ill. App. 3d at 216).

¶ 31                                Reasonable Foreseeability

¶ 32        "A criminal attack by a third person is reasonably foreseeable when the circumstances are such as to put a reasonably prudent person on notice of the probability of an attack or when a serious physical altercation has already begun." *Haupt*, 358 Ill. App, 3d at 219. Foreseeability depends on what the defendant knew at the time of the incident, not "what may appear through hindsight." *Lewis*, 222 Ill. App. 3d at 851. Thus, the criminal attack in *Shortall* was reasonably foreseeable because the bartender saw three men verbally and physically harassing the plaintiff and another patron inside the bar before a fight erupted outside, and a bouncer watched the fight as it escalated. *Shortall*, 283 Ill. App. 3d at 443.

¶ 33        In *Osborne*, the attack was reasonably foreseeable because the bouncers knew the attackers were "combative and angry" and involved in a physical altercation inside the club. *Osborne*, 312, Ill. App, 3d at 149. Further, after ejecting the attackers, "the bouncers exported the club's problems to the sidewalk and ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of" the attackers. *Id*. The attack in *Haupt* was also foreseeable—the bar owner knew through experience that the attacker had a propensity for fighting, saw the attacker start a fight with the plaintiff in the bar, and kicked out both men at the same time. *Haupt*, 358 Ill. App. 3d at 219-20.

¶ 34        Unlike in *Shortall*, *Osborne*, and *Haupt*, no physical altercation occurred inside the bar that would have put defendants on notice that a shooting might occur outside. Elliston testified that

while standing at the bar, he had a normal interaction with Ticonovic, who bought him a beer. Nothing in the record suggests the bartender or other bar employees heard or knew that a patron purportedly made derogatory or threatening remarks to Elliston while he was in the bathroom that could provoke an altercation. After calling Gonzales from inside the bathroom, Elliston immediately left without speaking to anyone, including the bartender or the men sitting at the table. Further, the evidence did not show that the parties involved in the fight had been in previous altercations in the bar with plaintiffs or anyone else.

¶ 35    Plaintiffs contend that the bar's late night hours and absence of security made the shooting reasonably foreseeable. For support, plaintiffs rely on *Libolt v. Weiner Circle, Inc.*, 2016 IL App (1st) 150118. In *Libolt*, the defendant hot dog restaurant was known for "schtick" of employees yelling at customers, especially during late night hours when many patrons were intoxicated. While waiting in line early in the morning, the plaintiff noticed a man coming in and out of the restaurant. Restaurant employees yelled at the man, telling him to leave and one employee waved a large spoon at him in a "fairly aggressive" and threatening manner. The man left but when he later returned, the interaction between him and the employees escalated, and, at some point, he ran into the plaintiff, knocking her down and causing her to break her wrist and elbow. The plaintiff sued the restaurant alleging, in part, that it was negligent for failing to control the customer and remove him from the premises and encouraging its employees to antagonize, aggravate, and provoke patrons.

¶ 36    The trial court granted summary judgment to the restaurant, but the appellate court reversed. The court found plaintiff's injury reasonably foreseeable "in a restaurant where 75% of patrons are intoxicated during late night hours and where the gimmick that brings these patrons in is the effort made to engage with customers in a banter which, late at night,

apparently drifts into insults and vulgarity, and where restaurant employees, potentially as part of the schtick, brandish wire grill brushes at patrons and threaten patrons with pepper spray." *Id.* ¶ 32.

¶ 37    *Libolt* is distinguishable. No employees of the bar ever acted aggressively toward or attempted to antagonize patrons, which could be reasonably seen to result in an altercation. Moreover, contrary to plaintiffs' contention, *Libolt* did not hold that a business open late at night has a duty to provide security. And plaintiffs cite no case reaching that conclusion.

¶ 38    Because the evidence failed to show the shooting was reasonably foreseeable, the trial court did not err in entering summary judgment for defendants.

¶ 39                            No Evidence Property Owners Controlled Bar

¶ 40    Plaintiffs contend summary judgment was not proper as to the McElroys. According to plaintiffs, a question exists on whether the McElroys had control of the bar, which can only be determined by the terms of the lease agreement with Steinke, which they failed to produce.

¶ 41    Our supreme court has held "the tenant who is in possession, not the landlord, is liable for injuries sustained by third persons***. [Citations.] 'The basic rationale for lessor immunity has been that the lease is a conveyance of property which ends the lessor's control over the premises, a prerequisite to the imposition of tort liability.' [Citation.] Thus, under the general rule, only * * * the party in possession and control of the entire premises[ ] could be held liable for injuries to persons on the property." *Wright v. Mr. Quick, Inc.*, 109 Ill.2d 236, 238-39 (1985).

¶ 42    Robert McElroy testified that he and his wife owned the property and leased it to Ziemek month-to-month after the lease expired around 2010 but had no ownership interest or control of the bar. Indeed, he testified he only went into the bar to collect rent and was never there

during late night hours. Plaintiffs presented no evidence to the contrary that would have created a question of fact as to the McElroys' ownership or control. Instead, plaintiffs contend the lease terms dictated McElroys purported control of the premises and failed to produce the lease. But the plaintiffs never argued before the trial court that the McElroys' failure to produce the lease amounted to spoliation of evidence. Nor did they allege the McElroys intentionally withheld the lease. As a consequence, plaintiffs waived the issue on appeal. *Mabry v. Boler*, 2012 IL App (1st) 111464 ¶ 15 (arguments not raised before the trial court are waived on appeal).

¶ 43    Affirmed.