2018 IL App (2d) 170249
Nos. 2-17-0249, 2-17-0537, 2-17-0550 cons.
Opinion filed June 28, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| RICHARD COOKE and REBECCA OBERJAT, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 12-L-87 |
| | ) | |
| MAXUM SPORTS BAR & GRILL, LTD.; GREGORY M. SERAFIN, Individually and as Agent of Maxum Sports Bar & Grill, Ltd.; and JOSEPH B. TOPOR, Individually and as Agent of Maxum Sports Bar & Grill, Ltd., | ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Maxum Sports Bar & Grill, Ltd., Defendant-Appellant). | ) ) | Dorothy French Mallen, Judge, Presiding. |

_____

| | | |
|---|---|---|
| RICHARD COOKE and REBECCA OBERJAT, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 12-L-87 |
| | ) | |
| MAXUM SPORTS BAR & GRILL, LTD.; GREGORY M. SERAFIN, Individually and as Agent of Maxum Sports Bar & Grill, Ltd.; and JOSEPH B. TOPOR, Individually and as Agent of Maxum Sports Bar & Grill, Ltd., | ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Maxum Sports Bar & Grill, Ltd., Defendant- | ) | Dorothy French Mallen, |

Appellee).                          )    Judge, Presiding.

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Hutchinson and Spence concurred in the judgment and opinion.

## OPINION

¶ 1 On October 24, 2010, plaintiffs, Richard Cooke and Rebecca Oberjat, were attacked and battered in a parking lot after leaving a nightclub operated by defendant Maxum Sports Bar & Grill, Ltd. (Maxum). Plaintiffs and their attacker, Antoine Matthews, were all patrons of Maxum prior to the attack. Matthews was subsequently convicted of aggravated battery and served three years in prison.

¶ 2 Subsequently, plaintiffs sued Maxum and Maxum's owners, defendants Gregory M. Serafin and Joseph B. Topor, individually and as Maxum's agents, seeking damages for their injuries. Plaintiffs alleged that defendants negligently failed to protect them from the attack. A bench trial was held. At the close of plaintiffs' case, the trial court directed a finding in favor of Serafin and Topor as to their individual liability. At the end of the trial, the court found against Maxum and in favor of plaintiffs but found in favor of Maxum and against Oberjat on Maxum's affirmative defense of contributory negligence. The court awarded damages to Cooke in the amount of $50,622.29 and to Oberjat in the net amount of $2,894,519.09, after finding Oberjat to be 50% contributorily negligent.

¶ 3 Maxum appeals, arguing that the trial court erred in entering judgment in favor of plaintiffs where it had no duty because (1) the attack occurred after plaintiffs voluntarily left Maxum's premises and, therefore, they were no longer its business invitees, (2) the attack was not reasonably foreseeable, and (3) the relevant public-policy considerations such as the magnitude of the burden of guarding against the injury and the consequences of placing that burden upon Maxum did not warrant imposing a duty.

¶ 4    Plaintiffs appeal the trial court's directed finding in favor of Serafin and Topor. Further, Oberjat appeals the trial court's finding of 50% contributory negligence. For the reasons that follow, we affirm.

¶ 5                          I. BACKGROUND

¶ 6                          A. Complaint

¶ 7    On January 26, 2012, plaintiffs filed a two-count complaint sounding in negligence against defendants, seeking damages incurred as a result of injuries plaintiffs sustained from Matthews' criminal attack. Plaintiffs alleged that on October 23 and 24, 2010, Matthews committed assault and battery against them while they were "business invitees" of Maxum. The attack began in Maxum's pool room and continued in its front entrance. Plaintiffs further alleged that, immediately following the initial attack, Matthews attacked them in the strip mall parking lot outside, resulting in significant injuries to both plaintiffs.

¶ 8    Plaintiffs alleged that defendants owed them a duty to protect them from the criminal acts of Matthews. Plaintiffs alleged that Maxum was liable for its negligent failure to properly hire, train, and supervise its security guards, for its negligent management of its security guards on the dates at issue, and for its negligent failure to take proper steps to protect plaintiffs from the foreseeable harm committed by Mathews. Plaintiffs also alleged that Topor and Serafin were liable due to their negligent failure to properly hire, train, and supervise Maxum's security guards. Plaintiffs further alleged that defendants breached their duty by negligently (1) allowing Matthews to remain on the premises when defendants knew that he had been involved in prior altercations, (2) failing to eject Matthews from the premises after security guards saw him attack Cooke in the pool room, (3) failing to eject Matthews from the premises after a security guard saw Matthews attack plaintiffs at Maxum's front door, (4) allowing Matthews to follow plaintiffs

into the parking lot, (5) failing to properly train their security guards, and (6) instructing their security guards that their obligations to protect patrons ended at Maxum's front door.

¶ 9    Defendants filed affirmative defenses asserting that plaintiffs failed to exercise reasonable care for their own safety, that any recovery should be reduced by the percentage of negligence or fault attributable to each plaintiff, and that any recovery should be barred in the event that any negligence or fault attributable to each plaintiff was greater than 50%.

¶ 10    On May 13, 2013, defendants filed a third-party complaint for contribution against Matthews.  Matthews was not served and the trial court dismissed the complaint pursuant to Illinois Supreme Court Rule 103(b) (eff. July 1, 2007) on October 28, 2015.

¶ 11                                B. Motions

¶ 12    On February 7, 2013, defendants filed a motion for summary judgment, arguing that they owed no duty of care to plaintiffs when Matthews attacked them, because the attack occurred off of defendants' premises.  On November 12, 2013, the trial court denied defendants' motion.

¶ 13    Defendants filed a motion to reconsider or, in the alternative, to certify a question for interlocutory appeal.  The trial court denied the motion for reconsideration but certified for interlocutory appeal the following question concerning the scope of defendants' duty to plaintiffs:

> "When a tavern owner has a patron shadowed by security because of his violent behavior, does the tavern have a duty to plaintiff patrons threatened by the shadowed patron to provide a means for safe egress, including escorting them to their car, when an attack on the plaintiffs by the shadowed person takes place three storefronts away and around the corner from the tavern, in the common parking lot, which is under the exclusive control of the tavern's landlord?"

¶ 14    On April 25, 2014, this court denied defendants' petition for leave to appeal, pursuant to Illinois Supreme Court Rule 308 (eff. July 1, 2017), stating that the "petition presents a mixed question of law and fact with unresolved issues of material fact." We remanded the case to the trial court for further proceedings.

¶ 15    On December 31, 2014, defendants filed a motion to dismiss Serafin and Topor, which the trial court denied. On October 13, 2015, defendants filed a second motion for summary judgment on the issue of lack of duty, which the trial court also denied.

¶ 16                                C. Bench Trial

¶ 17    A bench trial began on November 21, 2016, and continued on nonconsecutive days until January 5, 2017.

¶ 18    Oberjat testified as follows. The first time Oberjat went to Maxum was in the summer of 2010. The attack at issue occurred on October 23, 2010. Oberjat had been to Maxum five or six times before the date of the attack. When Oberjat was at Maxum she usually saw security guards inside and outside of the establishment. Every time Oberjat went to Maxum's pool room before the date of the incident, Matthews was present. On a prior occasion, Matthews tried to persuade Oberjat's friend to bet on a pool game. When her friend did not have money to bet, Matthews became aggressive and loud.

¶ 19    Oberjat testified that on October 23, 2010, she and Cooke arrived at Maxum to play pool. Oberjat drove and parked in the lot "around the corner" from Maxum's entryway. It took Oberjat 1 minute or 1½ minutes to walk from her car to Maxum's entryway. Oberjat and Cooke entered Maxum, bought drinks, and played pool together and separately. Oberjat then left the pool room to smoke a cigarette on the patio. A few minutes later, Cooke came out to the patio. He was "in panic mode." Cooke told Oberjat, "[W]e have got to get the F out of here. We have to go." Minutes later Matthews came after Cooke in an aggressive, loud, and violent manner,

approached Cooke's face, and yelled, "B***, give me my money." Oberjat testified that Matthews "was loud and he was basically in [Cooke's] face like instigating a fight, *** and [Cooke] was trying to back away." This was the first time Oberjat saw Matthews that night. Matthews and Cooke left the patio and Oberjat finished her cigarette.

¶ 20 Oberjat testified that, after she finished her cigarette, she saw Cooke and Matthews standing by the front door; she was aggravated and confused. Oberjat recalled "storming" out of the bar and said either "mother f***" or "what the f***." Oberjat "got in between [Cooke and Matthews]," held her hands up, and tried to ask Matthews, "what's going on [and] why are you still bothering him?" Oberjat also asked Matthews to "calm down" and "what do you want from us?" A security guard was outside standing about two to four feet from them. Oberjat "looked up at the security guard who was just standing there doing nothing and even [Cooke] tugged on his arm, we are both like, hey, man, this guy is like, basically harassing or want[s] to get, you know, his money." Matthews tried to get around Oberjat to get to Cooke. Oberjat asked the security guard to get "involved," but he "just basically stood there." Matthews was loud and aggressive saying, "I'm going to kick your ass" and "B***, give me my money." Matthews was loud enough for the security guard to hear, but he did nothing.

¶ 21 Oberjat testified that, after realizing that Matthews was getting aggressive, she and Cooke just wanted to get out of there. So Oberjat grabbed Cooke's arm and they went straight to her car. It took one to two minutes to get to Oberjat's car. They went directly and swiftly to her car because they wanted to get away from Matthews. When Oberjat and Cooke arrived at her car, she was blindsided. Oberjat saw Matthews "start running around the building to the back of the car, and he proceeded to punch [Cooke] and he punched me." Oberjat fell and Matthews then kicked and punched Cooke "even as he was down." Then Matthews kicked and punched Oberjat while she was down, toward the back of the car. Matthews continued to kick Oberjat until she

played dead. After playing dead for about 5 to 10 minutes, she crawled around to the front of the car, calling for Cooke. Cooke was unresponsive, lying in a pool of blood. Oberjat went to Maxum to get help. When the ambulances and police arrived, Oberjat could not move her arm at all. It was swollen and stiff, and her hips and knees hurt. Oberjat suffered three fractures—to her right shoulder, right elbow, and right wrist—requiring surgery and the insertion of hardware. She developed complex-regional-pain syndrome in her right arm, which spread to the left arm.

¶ 22    Cooke testified as follows. Cooke and Oberjat arrived at Maxum between 11 and 11:30 p.m. on October 23, 2010. Oberjat parked in the closest spot available, around the corner from Maxum's front door, about three storefronts away. Cooke and Oberjat walked into Maxum, ordered drinks, and walked into the pool room. A bouncer stood in the back corner of the room. Cooke had been to Maxum a couple of times before that evening. To play pool at Maxum, a new player had to put quarters on the pool table and play the winner of the previous game. Cooke had seen betting in the pool room on prior occasions.

¶ 23    Cooke testified that Oberjat left the pool room to smoke a cigarette outside in the "beer garden." Matthews asked Cooke if he wanted to bet on a game of pool. Cooke agreed and placed $20 on the pool table. After the game, Matthews picked up the money and started screaming, "hey, mother f***, you're going to pay me my f*** money." Cooke told Matthews that he did not know what Matthews was talking about. Matthews replied, "You mother f*** heard what I said. God damn it. You pay me my F*** money." Cooke told Matthews that he did not come "here for this *** I'm out of here, I'm leaving, [and] just leave me alone." Cooke believed that "there was absolutely no way [the bouncer in the pool room] couldn't have heard [the ruckus]."

¶ 24    Cooke started to walk away to find Oberjat. Matthews said, "I'm going your kick your f*** ass." Matthews continued to scream at Cooke and followed him into the beer garden,

saying, "mother f***, I'm talking to you, [and] don't f*** walk away from me." Matthews also shoved Cooke from behind.

¶ 25    Cooke testified that he found Oberjat and told her that he had "to get the hell out of here, *** this guy's starting trouble, [and] it's getting ugly." Oberjat wanted to finish smoking her cigarette. Then, Matthews entered the beer garden and shouted at Cooke, "b***, I told you to pay me my f*** money." Cooke told Oberjat that they had to leave and he told Matthews that he would wait for Matthews outside. Cooke thought that the entrance would be a safe place to wait until Oberjat was ready to leave, "because that's where the bouncers were" and he did not "want to get jumped on."

¶ 26    At this point, a video surveillance recording was played in court showing Maxum's front-door area on the night of the incident. The video had been admitted into evidence earlier by stipulation of the parties.

¶ 27    Cooke testified that the video showed him at Maxum's front door as he waited for Oberjat. Matthews appeared and tried to "drag" Cooke "out into the parking lot." A bouncer, standing nearby saw Matthews' behavior but did nothing. Oberjat exited Maxum's front door and stood between Cooke and Matthews. She asked Matthews, "What do you want?" Oberjat also told Matthews, "knock it off [and] we're not here for any trouble." Cooke grabbed the bouncer by the arm and asked for help but the bouncer did nothing. Cooke told Matthews loudly, "I'm not looking for any trouble; I don't know what you're talking about; [and] just leave me alone." The bouncer "had a front row seat" and could hear what was going on, but he did nothing. Oberjat, still standing between the two men, held up her hands, trying to diffuse the situation. The bouncer stood behind Matthews but did not warn him, offer to help Cooke and Oberjat, offer to separate them from Matthews, or offer to call the police. After Matthews appeared to leave, Oberjat grabbed Cooke's hand.

¶ 28    Cooke testified that he and Oberjat went directly to Oberjat's car in the parking lot around the corner, which took about one minute.  About 50 seconds after Matthews appeared to leave the scene, he appeared again in the video, near Maxum's front door.  Matthews pointed his finger at the security guard and exited from view, toward the parking lot, in the direction that Cooke and Oberjat had gone.  The bouncer stood and watched.  In the parking lot, near the car, Matthews appeared and punched Cooke in the face.  Cooke did not recall the events that occurred in the parking lot after he was punched.

¶ 29    Frank Jarosz testified in a sworn videotaped evidence deposition as follows.  At the time of the attack, Jarosz worked for Serafin and Topor at Maxum as the operations manager.  Jarosz was responsible for hiring security guards.  He had no formal training in security and had never managed a nightclub before.  Prior to working at Maxum, he had managed a large resort that included two bars and a restaurant.  Jarosz hired security personnel through a man named Bill Brice.  Brice brought Jarosz applicants whom Brice knew or had worked with in the past.  When Brice brought someone to Jarosz, Jarosz would interview him and, if he liked him, would "put [him] on the floor, give [him] a trial basis, two to four weeks or so, [and] depending on how [he] did," would decide whether to hire him.

¶ 30    Jarosz testified that he did not require security job applicants to fill out applications, because they came highly recommended from Brice.  Jarosz did not do criminal background checks or ask for employment references, because of Brice's recommendations.  Jarosz hired Dmitri Grimm, the bouncer who stood at the front door on the evening of the attack.  Grimm was recommended by Brice, who told Jarosz that Grimm was an experienced bouncer.  Jarosz did not ask Grimm to fill out a job application or ask Grimm for references.  Serafin paid the bouncers in cash.

¶ 31 Jarosz further testified that, when Serafin hired Jarosz, Serafin did not provide written materials that Jarosz could use to train the bouncers, but Jarosz and Serafin discussed training "every once in a while." Maxum did not keep security logs and had no written rules for security. Gambling and violence were not tolerated at Maxum, and anyone gambling would be removed immediately. Gambling can cause potential hostile events. Matthews was a regular at Maxum, and Jarosz had thrown him out in the past for gambling. Jarosz allowed Matthews back into Maxum after Matthews apologized. Verbal threats of physical violence were not allowed at Maxum. If a patron told a bouncer that someone was threatening him or her, the bouncer would be responsible for protecting that patron. Regarding fighting, Jarosz testified that the bouncers were trained and that everyone knew that Maxum had "a zero tolerance policy on fighting in the bar. There was absolutely none of that allowed. Basically, once that happened, the bouncers would take the first party and escort them out the door, and then usually the second party *** waited a few minutes and they—then were escorted out, but never, never, were they escorted out together."

¶ 32 Jarosz testified that, on the evening in question, one of the bouncers told Jarosz that there was trouble with Matthews. The bouncer in the pool room, Galason, told Jarosz that "they were arguing *** over gambling" in the pool room. Earlier in the evening, there were two incidents involving Matthews: one where Matthews "was trying to hustle a couple of guys and they didn't want to play for money [and Matthews] got irritated with them" and another "incident with a Lithuanian guy [where] the bouncer broke it up." Jarosz "put a bouncer on [Matthews]. [Jarosz] felt like [Matthews] was looking for trouble."

¶ 33 Jarosz testified that he stationed a bouncer in front of Maxum's door, on the sidewalk. Serafin knew that Jarosz stationed a bouncer there, but Serafin was not at Maxum on the evening of the attack. Jarosz agreed that a bouncer would not be doing his job properly if he did nothing

while he saw an aggressive person attempting to grab another person and pull that person into the parking lot. Jarosz stated that a security guard would not be acting the right way if two people asked him for help regarding an aggressive person and the bouncer did nothing. Jarosz testified that, on the night of the attack, plaintiffs did not tell Jarosz that Matthews had threatened them with physical violence. Jarosz agreed that, if plaintiffs told a bouncer that Matthews had threatened them with physical violence, it was the bouncer's responsibility to protect them.

¶ 34    Ronald Hauri, an expert in the field of security, testified on plaintiffs' behalf. Hauri reviewed Maxum's advertisements, the police reports for the past five years of incidents at or near Maxum, Galason's statement, and the video surveillance tapes. Hauri opined that Maxum marketed to a clientele that created increased risk for arguments and fights. The police reports established that Maxum needed security and that fights could continue or erupt in the parking lot. Maxum's management was aware of the risks in the parking lot. According to Galason's statement, Maxum had problems every weekend, but it did not keep a security log. Hauri opined that, without a security log, a bar cannot adjust to security needs or develop protocols to prevent incidents from happening. Hauri was critical of the fact that Maxum's owners, managers, and bouncers had no security training and no written protocols and that the bouncers were not vetted with background checks.

¶ 35    Hauri also opined that, due to Matthews' history of being loud and aggressive, he should have been permanently banned from Maxum prior to the evening of the attack. Based on Hauri's review of the surveillance tape of Maxum's front entrance on the night in question, Hauri opined that, when Matthews grabbed Cooke's hand and attempted to pull Cooke, Grimm should have intervened and told Matthews to leave the premises. Also, Grimm should have told Cooke to go back inside for his own safety. Instead, Grimm did nothing to intercede, and the altercation continued and escalated. Grimm should have deescalated the situation instead of allowing

Matthews a clear path to plaintiffs' personal space. If he had been properly trained, Grimm would have separated Matthews and Cooke by placing his body between them. Grimm also should have separated the parties before plaintiffs had gone to their car. Grimm did nothing to dissuade Matthews from exiting the bar in the same direction that plaintiffs had gone, within 60 seconds after they left. If a bouncer is not sure whether an aggressor is still present, the bouncer should escort any threatened patrons to their car.

¶ 36 Hauri thus opined that Maxum failed to provide adequate protection or security to plaintiffs. Jarosz had trouble with Matthews on prior occasions and earlier that evening. That evening, Jarosz ordered a bouncer to shadow Matthews because he believed that Matthews was looking for trouble. Management knew that Matthews was aggressive, loud, and obnoxious. Management should have told Matthews to leave Maxum and, if he refused, management should have called the police. Hauri opined that the actions of Maxum's management and bouncers fell below the standard of care and were a proximate cause of Matthews' attack in the parking lot.

¶ 37 John Harris, an expert in the field of security, testified on defendants' behalf. Harris testified that a bouncer is to remain visible, observe, report anything unusual, be present to enforce rules, and be a deterrent to criminal activity. A bouncer should call 911 if it looks like a fight is going to break out. A bouncer can interject himself into a fight to deescalate it, and it is a bouncer's job to deescalate situations before they escalate into fights. Harris opined that the bouncer's responsibilities end at the establishment's front door.

¶ 38 Harris testified that his reviewing of five years of police reports revealed three fights at Maxum. In all three fights, the bouncers intervened. Harris opined that Matthews never caused a problem prior to the evening of the attack. Maxum implemented proper security procedures to protect its patrons and could not have reasonably anticipated Matthews' criminal attack. Harris explained that, although management knew that Matthews had been loud and obnoxious, he had

not been in a physical altercation prior to the evening at issue and he did not threaten plaintiffs with physical violence that evening. Harris acknowledged that Jarosz had Matthews shadowed by a bouncer that evening.

¶ 39 Harris testified that he reviewed the surveillance video showing Maxum's front door and the parking lot on the evening of the attack. Harris opined that there were no violent acts at the front door. Grimm made his presence known and acted as a deterrent by stepping between Matthews and plaintiffs, which deescalated the situation. A bouncer should displace parties who are arguing by putting them off the property, and this is what happened in this case. Harris opined that plaintiffs and Matthews left in opposite directions. Although Grimm did not testify, Harris opined that it was reasonable for Grimm to assume that the situation had deescalated. Harris opined that Maxum had no responsibility to protect plaintiffs once they left the front entrance of the bar. Maxum had no responsibility to follow patrons off the premises after a verbal argument, and it was not standard practice to escort patrons to their cars. Harris was aware of Matthews' testimony that Oberjat called him a "n***" and Galason's statement that he heard Oberjat use the "n" word while plaintiffs and Matthews were in the bar. Harris opined that Maxum acted appropriately and in accordance with industry best practices on the night of the attack.

¶ 40 During cross-examination, Harris testified as follows. Harris agreed that it is bad if a patron comes in a bar looking for trouble. In such a case, it is prudent for a manager to eject that patron before trouble starts. However, that decision can be tempered by that patron's past behavior. Harris agreed that competitive games like pool can trigger violence. Harris also agreed that it is important to train security personnel, that security personnel are present to protect patrons from violent acts, and that a bar should have written security policies. Harris

testified that a bar manager should check the backgrounds of the people he hires for security. Harris agreed that it is foreseeable that there could be arguments and fights in any bar.

¶ 41    Matthews testified as follows.  Matthews went to Maxum on October 23, 2010, to play pool.  He had been going to Maxum to play pool for three years, two or three times a month.  On the evening of the attack, he gave Cooke, whom he did not know, $20 to buy two beers at the bar.  Matthews wanted to play pool with Cooke.  Cooke did not return to the pool room and after about 20 minutes Matthews went to look for Cooke.  He found Cooke in another area of Maxum and asked, "What's up?  Where's the beers?"  Matthews testified that at that point Oberjat came up to him, pushed him, and said, "get out of my face you n***."  Bouncers came over, Matthews explained the situation, and a bouncer "pulled [Matthews] to the front then the other bouncers brought [plaintiffs] to the front and they kicked us out."

¶ 42    Matthews testified that he waited outside of Maxum and tried to get Cooke to come over and talk to him about the money.  While in front of Maxum, Matthews approached Cooke and tried to get him to leave the property, but Cooke would not leave the front door area.  Matthews testified that he did not touch Cooke or physically try to get Cooke to leave.  Oberjat stepped between Matthews and Cooke and told the bouncers, "Get this f*** n*** out of here."  After 10 minutes of conversation at the front door, Matthews left and went around to a McDonald's restaurant, watched Maxum's front door, and waited for plaintiffs to leave.  When plaintiffs left to go to their car, Matthews wound his way through parked cars so the bouncers would not see him and met up with plaintiffs at the side of the building, where Oberjat had parked her car. Matthews wanted to confront Cooke about his money, but, before he could confront Cooke, Oberjat ran toward Matthews and punched him in the face.  Matthews punched Oberjat back. Oberjat told Matthews, "Get the f*** out of here, n***."  Matthews testified that Oberjat

blindsided him, he reacted, and he was very angry. Matthews then ran around to the other side of the car and punched Cooke and then went back around the car and attacked Oberjat.

¶ 43    At the close of plaintiffs' case-in-chief, the trial court directed a finding in favor of Serafin and Topor.

¶ 44                              D. The Trial Court's Ruling

¶ 45    Following the trial, on March 2, 2017, the trial court entered a 33-page memorandum opinion and order finding in favor of plaintiffs and awarding Cooke $50,622.29 and Oberjat $2,894,519, after reducing her award by 50% due to its finding of contributory negligence.

¶ 46    The trial court determined that Maxum owed plaintiffs a duty, stating:

"Under the circumstances as shown by the evidence, it is clear that Plaintiffs have proven that Maxum, as a reasonably careful bar, had sufficient knowledge to reasonably foresee that if the staff did not intervene to de-escalate the argument or separate the parties by time and space, a fight could break out. Thus, Maxum had a duty to protect the Plaintiffs from injuries that they could sustain if a physical fight broke out."

¶ 47    The trial court found that Maxum breached its duty by negligently (1) failing to eject Matthews from the premises when the security guards saw him attack plaintiffs at the entrance to the bar, (2) allowing Matthews to follow plaintiffs into the parking lot after he had attacked them and Maxum knew or should have known that Matthews would continue his assault and battery, and (3) failing to provide plaintiffs with a safe egress.

¶ 48    The trial court found that plaintiffs failed to prove that Maxum breached its duty by negligently (1) allowing Matthews on the premises, (2) allowing Matthews to remain on the premises after he was involved in altercations with two other patrons that evening, (3) failing to eject Matthews from the premises when the security guards saw him attack Cooke in the pool room, and (4) failing to properly train and supervise the security guards.

¶ 49 On March 31, 2017, Maxum filed a notice of appeal (No. 2-17-0249). Also, on March 31, 2017, plaintiffs filed two posttrial motions: (1) seeking a modification of the judgment to vacate the directed finding in favor of Serafin and Torpor and to find that they are jointly and severally liable with Maxum; and (2) seeking a modification of the judgment to vacate the finding that Rebecca Oberjat was 50% contributorily negligent. On June 14, 2017, the trial court denied plaintiffs' posttrial motions. On July 13, 2017, Maxum filed its second notice of appeal (No. 2-17-0537). On July 13, 2017, plaintiffs filed a notice of appeal from the denial of their posttrial motions for modification of the judgment (No. 2-17-0550). This court consolidated all three appeals.

¶ 50                                      II. ANALYSIS

¶ 51                                    A. Maxum's Appeal

¶ 52 Maxum argues that the trial court erred in entering judgment in plaintiffs' favor, because it did not have a duty to protect plaintiffs from Matthews' attack.

¶ 53 A negligence claim requires "the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). Questions regarding breach of a duty and proximate cause of the injury are issues of fact, reserved for the trier of fact to decide. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010). After a bench trial, a trial court's findings of fact will not be disturbed on appeal unless such findings are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). A decision is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Id*. at 252.

¶ 54 However, whether a duty exists is a question of law. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 13. Thus, we review *de novo* a trial court's determination regarding whether a

defendant owed a duty. See *Krywin*, 238 Ill. 2d at 226. Where no duty exists, the plaintiff cannot recover as a matter of law. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22.

¶ 55   Generally, a possessor of land owes no duty to protect lawful entrants from criminal attacks by third parties. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 243 (2000). However, there is an exception to this rule where the possessor of land and the entrant stand in a special relationship. *Id*; see also Restatement (Second) of Torts § 314A (1965) (cited with approval by *Hills*, 195 Ill. 2d at 243). One special relationship, that of business invitor and invitee, can give rise to a duty to protect an individual from criminal attack. *Hills*, 195 Ill. 2d at 243-44. One reason for recognizing the relationship of business invitor and invitee as a special relationship is that, generally, "commercial establishments are well positioned 'to know the extent of crime on the premises *** to take measures to thwart it and to distribute the costs' associated with providing security." *Id*. at 245 (quoting *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 903 (Tenn. 1996)).

¶ 56   However, the existence of a special relationship, alone, is not sufficient to impose a duty upon the possessor of land to protect lawful entrants from the criminal acts of third parties. *Id.* at 243. Before a duty to protect will be imposed on a possessor of land, the court must also consider (1) whether the criminal attack was reasonably foreseeable, (2) the likelihood of the injury, (3) the magnitude of the burden to guard against the injury, and (4) the consequences of placing that burden upon the possessor. *Marshall*, 222 Ill. 2d 436-37.

¶ 57                          1. Plaintiffs' Status as Invitees

¶ 58   Maxum contends that it owed no duty to plaintiffs when the attack occurred, because plaintiffs' status as business invitees ceased when they voluntarily left Maxum's premises, thereby terminating the special relationship and any duty that Maxum owed. Plaintiffs argue that

this is not a premises-liability case; it is a duty-to-protect case. Plaintiffs contend that the trial court correctly ruled that duty does not depend on where an injury occurs but that, rather, location is just one factor in determining whether the criminal act was foreseeable.

¶ 59    If plaintiffs had been attacked and injured while on Maxum's premises, the resolution of this issue would be clearer; business invitor liability for foreseeable criminal attacks on the premises is well established. See, *e.g., Lewis v. Razzberries, Inc.*, 222 Ill. App. 3d 843, 849 (1991) (citing Restatement (Second) of Torts § 344 (1965)). However, here, plaintiffs were attacked and injured in a parking lot owned by Maxum's landlord, around the corner from Maxum's front door and out-of-view from Maxum's bouncers.

¶ 60    The general rule is that a business invitee ceases to be an invitee, and the business invitor's duty ends, as soon as the invitee leaves the premises owned by the invitor. See *Lewis*, 222 Ill. App. 3d at 850 (holding that tavern owner did not owe patron a duty of care for the wrongful death that occurred 23 feet beyond the boundary of the tavern owner's property, because the patron was no longer an invitee).

¶ 61    For example, in *Badillo v. DeVivo*, 161 Ill. App. 3d 596 (1987), the plaintiff was attacked by another patron inside the bar. *Id*. at 597. The bouncers stopped the fight and kicked both patrons out. As the plaintiff was getting into her car a half block away from the bar, the other patron attacked her with a police baton. *Id*. The appellate court held that the bar had no duty to ensure the safety of its patrons off premises, even if an attack was foreseeable, because it would impose too heavy a burden on the bar. *Id*. at 599.

¶ 62    However, there are exceptions to the general rule that a bar owner's duty to protect its patrons from criminal acts of third parties ends at the bar's property line. In *Shortall v. Hawkeye's Bar & Grill*, 283 Ill. App. 3d 439 (1996), the appellate court reversed summary judgment in favor of the bar and held that the bar might have had a duty to protect the plaintiff

from the stabbing by a third party that occurred 15 minutes after the plaintiff had exited the bar to go to his car, which was about 60 feet away from the bar's property. *Id*. at 441, 444. The court reasoned that the bar "was under the same duty as if the fight had occurred inside the bar." The court explained that the dispute that eventually led to the fight occurred in the bar, the bar escalated the fight by ushering some patrons outside into the fight, and the bar's bouncers watched the fight through a window but did nothing. *Id*. at 444. The court stated that "tavern owners may not avoid application of the duty to act to protect invitees from criminal attack by third parties simply because the disturbance giving rise to the duty occurs just out the front door, *especially where the owner contributes to the altercation by sending patrons out into it*." (Emphasis added.) *Id*. at 444.

¶ 63   Similarly, in *Osborne v. Stages Music Hall, Inc.*, 312 Ill. App. 3d 141 (2000), the patron of a nightclub was criminally attacked by another patron on the public sidewalk in front of the nightclub. *Id*. at 145. The trial court directed a verdict in favor of the nightclub, ruling that it owed no duty to the plaintiff, because the incident occurred on the sidewalk and the attacker's actions were not reasonably foreseeable. *Id*. at 146. The appellate court reversed the trial court and remanded the case, holding that, "[w]hether the assault takes place in or outside the actual premises of the business owner, the dispositive factor remains the reasonable foreseeability of the actions taken by the third party." *Id*. at 148. Earlier that evening, the nightclub's bouncers ejected two drunken men and locked the doors behind them. *Id*. at 143-44. The men pounded on the doors and yelled profanities at the bouncers. *Id*. The plaintiff and a friend walked out of the nightclub onto the sidewalk in front of the club. *Id*. at 144. One of the men outside slapped the plaintiff's friend, and, as the plaintiff approached her friend, one of the men spun and kicked her in the face. *Id*. at 145.

¶ 64    The *Osborne* court said that there was evidence that the attack was reasonably foreseeable. *Id*. at 149.   There was ample evidence that the bouncers knew that the men outside were drunk and angry, that they had already been involved in a fight inside the club, and that they had not cooled off after being evicted. *Id*.   Further, the bouncers saw the men's behavior from inside the club, but they did nothing after locking them out. *Id*.   The court also reasoned that the bouncers did not remove the men from the sidewalk or otherwise police the area, even though the club had controlled the sidewalk area earlier that evening.   The court stated that "the bouncers exported the club's problems to the sidewalk and then ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of potentially dangerous men." *Id*.   The court concluded that, based on the bouncers' knowledge and their inaction, "it was reasonably foreseeable that a patron would be attacked upon exiting the club and, therefore, it was incumbent on the club to guard against such an occurrence." *Id*.   The court relied on *Shortall*, among other cases, in concluding that the fact that the attack took place on a public sidewalk just outside the club did not dispose of the duty issue. *Id.* at 148.

¶ 65    More recently, in *Haupt v. Sharkey*, 358 Ill. App. 3d 212 (2005), this court held that a tavern could be liable for a criminal attack against one of its patrons that occurred just off the tavern's premises, in the parking area owned by the county. *Id*. at 219.   We concluded that "there is no bright line rule that a tavern owner's duty to protect its patrons from criminal acts of third parties absolutely ends at the precise property line of the tavern." *Id*. at 218.   This court held that a tavern's duty "to provide a reasonably safe means of ingress and egress to patrons," coupled with the foreseeability of the criminal attack that occurred as the patron was evicted from the tavern, precluded summary judgment in the tavern's favor. *Id*. at 219-20.

¶ 66    Maxum cites the following cases in support of its argument that it owed no duty to plaintiffs once they left its premises:  *Lewis*, 222 Ill. App. 3d 843 (holding that duty of care did

not extend outside the tavern owner's legal boundaries to an adjacent parking lot), *Badillo*, 161 Ill. App. 3d 596 (holding that tavern owner owed no duty to plaintiff attacked a half block from tavern-owner's property), and *St. Phillips v. O'Donnell*, 137 Ill. App. 3d 639 (1985) (holding that a tavern owner owed no duty to protect a patron who was attacked in the common parking area by another patron who had been ejected from the tavern). However, as we stated in *Haupt*, "these three cases do not create an insurmountable barrier to the existence of a duty beyond the doors of [a tavern-owner's] premises." *Haupt*, 358 Ill. App. 3d at 218; see also *Osborne*, 312 Ill. App. 3d at 148 (stating, "[w]e do not read these cases as creating an insurmountable barrier to the existence of a duty"). Further, the courts in both *Badillo* and *St. Phillips* recognized that, within limitations dictated by the facts of the case, an owner or operator of premises has a duty to provide a reasonably safe means of ingress and egress both on his or her premises and beyond the precise boundaries of such premises. *Badillo*, 161 Ill. App. 3d at 598 (citing *McDonald v. Frontier Lanes, Inc.,* 1 Ill. App. 3d 345, 351 (1971)); *St. Phillips*, 137 Ill. App. 3d at 643 (citing *McDonald*, 1 Ill. App. 3d at 351).

¶ 67    Thus, as *Haupt*, *Shortall*, and *Osborne* indicate, a bar owner's duty to protect patrons from criminal acts of third parties does not necessarily end at the legal property line of the bar and can extend to areas beyond. Therefore, the location of the attack, alone, does not dispose of the duty issue.

¶ 68                                 2. Foreseeability

¶ 69    No duty can exist unless the criminal attack was reasonably foreseeable. *Haupt*, 358 Ill. App. 3d at 216. This court has explained, "[a] criminal attack by a third person is reasonably foreseeable when the circumstances are such as to put a reasonably prudent person on notice of the probability of an attack or when a serious physical altercation has already begun." *Id*. at 219.

Foreseeability depends on what the defendant knew at the time of the incident, not on "what may appear through hindsight." *Lewis*, 222 Ill. App. 3d at 851.

¶ 70    Thus, the criminal attack in *Shortall* was reasonably foreseeable to the bar because the bartender saw three men verbally and physically harassing the plaintiff and another patron inside the bar, before a fight erupted outside, and a bouncer watched the fight through a window as it escalated outside. *Shortall*, 283 Ill. App. 3d at 443.    In *Osborne*, the attack was reasonably foreseeable because the bouncers knew that the attackers were "combative and angry" and had been involved in a physical altercation inside the club.    *Osborne*, 312 Ill. App. 3d at 149. Further, after ejecting the attackers from the club, "the bouncers exported the club's problems to the sidewalk and then ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of" the attackers.    *Id*.    The attack in *Haupt* was foreseeable because the bar owner knew through prior experience that the attacker had a propensity for fighting, on the night of the attack the bar owner saw the attacker start a fight with the plaintiff in the bar, and the bar owner kicked both men out of the bar at the same time.    *Haupt*, 358 Ill. App. 3d at 219-20.

¶ 71    Maxum argues that the criminal attack here was not reasonably foreseeable, because prior to the attack Matthews had not been involved in a fight or threatened anyone and Maxum had no history of fights on its premises that put it on notice of any danger to plaintiffs while they were on the premises.

¶ 72    However, Maxum, through Jarosz and the bouncers, knew, prior to the attack, that Matthews was angry that night.    They also knew that Matthews was angry with Cooke.    In addition, Jarosz directed Maxum staff to "shadow" Matthews that night, because Matthews had been arguing with other patrons.    Further, the staff knew that just prior to the attack Matthews shouted obscenities at Cooke, threatened Cooke, and grabbed Cooke outside Maxum's front

entrance, and Cooke and Oberjat had asked one of the bouncers for help dealing with Matthews. Grimm removed Matthews from the premises for bad behavior but allowed him to leave in the same direction as Oberjat and Cooke had, about one minute after they left. Given these facts and the bouncers' inaction, Matthews' criminal attack was reasonably foreseeable to Maxum. See *id.* (this court held that a criminal attack was reasonably foreseeable where, prior to the attack that occurred outside of the bar on public property, a bartender saw the attacker start a fight with the plaintiff in the bar and forced both men to leave the bar together); see also *Osborne*, 312 Ill. App. 3d at 149 (holding that the nightclub owner had a duty to the plaintiff for a criminal attack that occurred off of its premises, because "the bouncers exported the club's problems to the sidewalk and then ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of potentially dangerous men").

¶ 73 Maxum cites *Davis v. Allhands*, 268 Ill. App. 3d 143 (1995), to support its argument that Matthews' attack was not reasonably foreseeable. However, in *Davis*, there was no evidence that the bar owner and the one worker at the bar on the night of the attack knew of the attacker's bad behavior or bad reputation. *Id*. at 153. In this case, Jarosz and Grimm both knew that Matthews had a reputation for aggressive behavior and had been ejected from the bar previously, and Grimm saw Matthews argue with Cooke and Oberjat and try to pull Cooke away from the front of the bar. Therefore, *Davis* is distinguishable from this case.

¶ 74                             3. Remaining Duty Factors

¶ 75 Maxum argues that it owed no duty in light of the relevant "policy factors," *i.e.*, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on Maxum. Maxum also contends that the trial court did not consider these factors and that, therefore, the trial court's analysis was incomplete and requires reversal. The trial court's memorandum opinion indicates that it considered all four factors regarding whether Maxum

owed plaintiffs a duty, including "the magnitude of placing the burden on the defendant [and] the consequences of placing the burden on the defendant." Further, we agree that the trial court properly weighed these factors, as it reasoned:

"Under the circumstances as shown by the evidence, it is clear that Plaintiffs have proven that Maxum, as a reasonably careful bar, had sufficient knowledge to reasonably foresee that *if the staff did not intervene to de-escalate the argument or separate the parties by time and space*, a fight could break out. Thus, Maxum had a duty to protect the Plaintiffs from injuries that they could sustain if a physical fight broke out." (Emphasis added.)

Thus, we reject Maxum's contention that the trial court did not consider the factors at issue.

¶ 76 Maxum cites *Walton v. Spidle*, 137 Ill. App. 3d 249 (1985), to support its argument that it owed no duty because of the magnitude of the burden and the consequences of placing the burden on Maxum. However, *Walton* provides no analysis regarding these factors but, rather, provides a truism. See *id*. at 254 ("The difficulty placed upon the operator of a business in protecting customers after they leave the premises is obviously much greater than when they remain on the premises"). Thus, *Walton* does not control here.

¶ 77 Maxum also cites *Lewis*, 222 Ill. App. 3d 843, and *Badillo*, 161 Ill. App. 3d 596, to support its argument. In both cases, the appellate court held that a tavern owner had no duty to protect its patrons from injuries that occurred after the patrons left its premises. *Lewis*, 222 Ill. App. 3d at 852; *Badillo*, 161 Ill. App. 3d at 598. The courts reasoned that imposing such a duty would obligate all business owners to "police the streets so as to ensure their patrons' safe passage to their cars or even to their homes." *Lewis*, 222 Ill. App. 3d at 852; see *Badillo*, 161 Ill. App. 3d at 599. Nothing in this case indicates that the trial court imposed a duty upon Maxum to "police the streets" to ensure plaintiffs' safe passage. Rather, the evidence in this case revealed that the best practice for the security staff would have been to intervene and deescalate the

argument between Matthews and plaintiffs while they were at the front entrance and to separate Matthews and plaintiffs by time and space. "Measures easily could have been taken to protect [plaintiffs] against the apparent danger." *Osborne*, 312 Ill. App. 3d at 149. In this case, the magnitude of the burden of guarding against plaintiffs' injuries and the consequences of placing that burden on Maxum were slight. Accordingly, the trial court properly determined that Maxum owed plaintiffs a duty to protect plaintiffs from Matthews' criminal attack.

¶ 78                                    B. Plaintiffs' Appeal

¶ 79                    1. Directed Finding in Favor of Serafin and Topor

¶ 80     Plaintiffs argue that the trial court erred by directing a finding in favor of Serafin and Topor.

¶ 81     First we note that plaintiffs failed to include a proper statement of the standard of review, in violation of Illinois Supreme Court Rule 341(h)(3) (eff. Nov. 1, 2017) ("The appellant must include a concise statement of the applicable standard of review for each issue, with citation to authority, either in the discussion of the issue in the argument or under a separate heading placed before the discussion in the argument.").

¶ 82     In a bench trial, a motion for a directed finding is governed by section 2-1110 of the Code of Civil Procedure. 735 ILCS 5/2-1110 (West 2016). Under that statute, the trial court must "weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence." *Id*. Thus, "the trial court does not view the evidence most favorably to the plaintiff but, rather, (1) determines whether the plaintiff has made out a *prima facie* case, then (2) weighs the evidence, including that which favors the defendant." *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 311 (2000). "If, after weighing the evidence, the court decides that evidence necessary to [the] plaintiff's *prima facie* case has been negated, the court should grant the motion for a directed finding and enter judgment for the defendant." *Orbeta v.*

*Gomez*, 315 Ill. App. 3d 687, 690 (2000). We will not reverse a trial court's ruling on a motion for a directed finding unless it is contrary to the manifest weight of the evidence. *Id*.

¶ 83    Plaintiffs note that their complaint alleged that Serafin and Topor breached their duty to protect plaintiffs by negligently failing to provide them with a safe means of egress and by negligently failing to properly train and supervise Maxum's security guards.

¶ 84    Generally, a corporate director or officer is not liable for the negligence of the corporation unless he actively participated in the wrongful conduct or had sufficient knowledge thereof. *Zahl v. Krupa*, 399 Ill. App. 3d 993, 1013-14 (2010) (citing *McDonald*, 1 Ill. App. 3d at 357-58).

¶ 85    Here the trial court found that plaintiffs failed to establish a *prima facie* case, because there was no evidence that Topor and Serafin actively participated in the alleged negligent acts. The trial court also found that, at the time of the incident, Topor was no longer involved in Maxum's management and Serafin, while a bit more involved, had delegated the job to Jarosz. In addition, the trial court found that there was no evidence that either Topor or Serafin knew that Jarosz was incompetent or that he was not properly hiring or training security personnel. The record supports these findings. Topor testified that he was not involved in the business and that he "put everything up to [Serafin] and after we hired [Jarosz], all up to [him]." Topor also testified that he would not be surprised if Jarosz "handed down the reins" of security to someone else. Serafin testified that he allowed Jarosz to make security decisions and that he trusted his judgment. Accordingly, the trial court's decision granting Topor and Serafin's motion for a directed finding is not against the manifest weight of the evidence.

¶ 86    Plaintiffs do not contend that they established a *prima facie* case that Topor and Serafin actively participated in or had sufficient knowledge of the negligent failure to properly train and supervise Maxum's security guards or provide a safe means of egress. Instead, plaintiffs contend

that Topor and Serafin should be individually liable because they "delegated all duties of security to their employee, Frank Jarosz, *** knowing that he had no background in security [and] without offering him any training in security." However, this contention is forfeited because plaintiffs offer no relevant authority to support it.

¶ 87 Although plaintiffs cite *Zahl* and *Lowell Hoit & Co. v. Detig*, 320 Ill. App. 179 (1943), to support their argument, these cases actually support the trial court's directed finding. In *Zahl*, this court rejected the plaintiff's argument that the defendants should have exercised greater oversight over the president of the defendant corporation, who gambled away the plaintiff's investment, because "directors of necessity devolve upon subordinate officers the 'immediate management of the particular business.' " *Zahl*, 399 Ill. App. 3d at 1024 (quoting *Lowell Hoit*, 320 Ill. App. at 182). In *Lowell Hoit*, this court affirmed a finding of no liability against corporate officers in their individual capacities, stating that, "of necessity, it becomes proper that [corporate directors] entrust to subordinate and executive officers the discretionary powers which usually and ordinarily appertain to the immediate management of the particular business." *Lowell Hoit*, 320 Ill. App. at 181-82. Similarly, here, Topor and Serafin entrusted security to Jarosz. Thus, *Zahl* and *Lowell Hoit* support the trial court's decision in this case.

¶ 88 Plaintiffs also cite *Peck v. Cooper*, 112 Ill. 192 (1884), *Chicago Title & Trust Co. v. Munday*, 297 Ill. 555 (1921), *McDonald*, and *Miller v. Simon*, 100 Ill. App. 2d 6 (1968). In *Peck* and *Miller*, the corporate defendants were found individually liable after they personally directed the actions giving rise to the tortious conduct. *Peck*, 112 Ill. at 194 (the president of a bus company was held personally liable for the passengers' injuries after the president gave a direct order to the company's drivers to eject passengers based on their race); *Miller*, 100 Ill. App. 2d at 9-10 (the corporate officers were held personally liable for trespass after they personally directed the removal of trees and topsoil and the placement of gravel and parking signs onto the plaintiff's

land). In this case, Topor and Serafin did not direct the actions giving rise to plaintiffs' injuries. Therefore, *Peck* and *Miller* are distinguishable from this case.

¶ 89    In *Munday*, a receiver sued the directors of a bank for negligent supervision of two bank officers who defrauded the bank. *Munday*, 297 Ill. at 558. The receiver alleged that the directors did not manage, supervise, or investigate the officers even though they knew that the officers were "dishonest and incompetent and that they were managing and conducting the business dishonestly and incompetently." *Id*. at 560. In this case, there was no evidence that Topor or Serafin knew or believed that Jarosz or the bouncers were incompetent. Therefore, *Munday* is distinguishable from this case.

¶ 90    Finally, in *McDonald*, the appellate court identified a dangerous condition where a plaintiff had stepped onto a parkway and fallen into a hole 12 inches deep and 2 feet wide. *McDonald*, 1 Ill. App. 3d at 350. The court affirmed a finding of individual liability against the defendant, who was the president, sole shareholder, and manager of a tavern and bowling alley. *Id*. at 348, 358. The evidence showed that the defendant ordered the work done on his property that caused the hole and he knew that the hole was there. *Id*. at 349-50. Thus, the court held, "the negligence charged *** [was] part of the general mode of operation of the corporate business under [the defendant's] sole power of direction and control." *Id*. at 358. In this case, neither Topor's nor Serafin's power or control caused the negligent conduct. Thus, *McDonald* is distinguishable from this case.

¶ 91                          2. Finding of Contributory Negligence

¶ 92    Finally, Oberjat argues that the trial court erred by finding her 50% comparatively at fault.

¶ 93    A person is contributorily negligent when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances,

and such action is a proximate cause of his or her injury. *Logan v. U.S. Bank*, 2016 IL App (1st) 152549, ¶ 20. We will not disturb a trial court's finding of contributory negligence unless it is against the manifest weight of the evidence. *Walker v. Chicago Housing Authority*, 2015 IL App (1st) 133788, ¶ 47. We give great deference to the trial court's findings of fact, because the trial court is in a superior position to observe the witnesses' testimony, to judge their credibility, and to determine the weight their testimony and other evidence should receive. *Id*. A finding is against the manifest weight of the evidence only if the opposite conclusion is apparent or if the finding appears to be arbitrary, unreasonable, or not based on the evidence. *Id*.

¶ 94 Here, the trial court found Oberjat 50% contributorily negligent in two ways: (1) "she interjected herself into the argument between Mr. Matthews and Mr. Cooke. Her actions did not de-escalate the verbal dispute, but escalated it by her aggressive actions toward an angry man who she did not know. Further, she admitted she did not know what was going on. Yet she testified that she 'stormed' out of the bar, placed herself between the two men, pointed her finger in the face of Mr. Matthews, and demanded to know what the m…f… was going on. She used foul language which escalated the argument. These actions are not the actions of a woman exercising reasonable care for her own safety. She directed Mr. Matthews' attention to her when there was not need to do so"; and (2) when she "saw Mr. Matthews running toward her car, but in Mr. Cooke's direction, she ran directly at Mr. Matthews with her arms outstretched in attack mode. When Mr. Matthews reached Ms. Oberjat's car, she was at the driver's door about to get in. Mr. Cooke was at the passenger door. *** A reasonably careful person does not charge an angry man in a dark parking lot within a minute of a loud argument with that man. There was an alternate route to safety. Ms. Oberjat was contributorily negligent when she did not take the safer action."

¶ 95    These findings are supported by the record.  The evidence indicates that Oberjat went "storming" outside to see "what the f***" was going on" and placed herself between Cooke and Matthews.  Oberjat also pointed her finger at Matthews.  When Oberjat went to her car with Cooke, she stood at the driver's-side door of her car with her keys in her hand and, when she saw Matthews run toward Cooke, who was on the opposite side of the car, she ran, arms stretched out, at Matthews.  Oberjat admitted that, when Matthews ran toward her car, he was headed for Cooke, not her.  In light of this evidence, we cannot say that the trial court's finding that Oberjat was 50% contributorily negligent is against the manifest weight of the evidence.

¶ 96                                III. CONCLUSION

¶ 97    For the reasons stated, we affirm the trial court's order.

¶ 98    Affirmed.